NORTH CAROLINA FISHERIES AS-
SOCIATION, INC. and Georges
Seafood, Inc., Plaintiffs,

State of North Carolina, ex rel. James B.
Hunt, Jr., Governor, and North Carolina
Department of Environment, Health and
Natural Resources, Plaintiffs–Interve-
nors,

v.

William M. DALEY, Secretary
of Commerce, Defendant.

Civil Action No. 2:97cv339.

United States District Court,
E.D. Virginia,
Norfolk Division.

Sept. 28, 1998.

George M. Kelley, III, United States Attorney's Office, Norfolk, VA, Joel G. MacDonald, U.S. Department of Commerce, National Oceanic and Atmospheric Admin., Office of General Counsel, Gloucester, MA, Lois J. Schiffer, U.S. Department of Justice, Environmental Enforcement Section, Washington, DC, Eileen Sobeck, Office of the Attorney General, Environment & Natural Resources Division, Wildlife & Marine Resources Section, Washington, DC, Warigia Bowman, Wildlife and Marine Resources Section, United States Dept of Justice, Washington, DC, Charles R. Shockey, U.S. Department of Justice, Environmental & Natural Resources Div., Washington, DC, for William M. Daley.

Richard Ernest John Slaney, Wolcott, Rivers, Wheary, Basnight & Kelly, P.C., Virginia Beach, VA, for Natural Resources Defense Council.

Waverley Lee Berkley, III, Mark Steven Davis, McGuire, Woods, Battle & Boothe, Norfolk, VA, for North Carolina Fisheries Association, Inc., Georges Seafood, Inc.

Michael Vincent Hernandez, Professor, Regent University, School of Law, Virginia Beach, VA, Amy R. Gillespie, North Carolina Department of Justice, Raleigh, NC, Daniel F. McLawhorn, North Carolina Dept. of Environment & Natural Resources, Raleigh, NC, for The State of North Carolina.

Michael Vincent Hernandez, Professor, Regent University, School of Law, Virginia Beach, VA, Daniel F. McLawhorn, North Carolina Dept. of Environment & Natural Resources, Raleigh, NC, for North Carolina Department of Environment and Natural Resources.

### ORDER & OPINION

DOUMAR, District Judge.

For the last year and a half, commercial fishermen in North Carolina have remained

steadfast in the face of the Secretary of Commerce's recalcitrant stance concerning regulations setting a summer flounder fishery quota for the 1997 year. The Secretary contends that his quota poses no significant economic impacts on the small fishing communities along the coastline of North Carolina. The North Carolina fishermen have petitioned this Court to set aside the quota or to increase the amount of summer flounder that they are authorized to land for the 1997 year. In so petitioning, the North Carolina fishermen have argued that the Secretary's regulatory actions are arbitrary and capricious as well as inconsistent with the Regulatory Flexibility Act, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. §§ 601, et seq. (the "RFA"), and inconsistent with National Standard 8 of the Magnuson–Stevens Fishery Conservation and Management Act, as recently amended by the Sustainable Fisheries Act of 1996, 16 U.S.C. §§ 1801, et seq. (the "Magnuson Act"). Under both Acts, the Secretary must satisfy procedural safeguards that balances his obligation to conserve fishery resources with the potential adverse impacts his actions may have on fishing communities. *See Northwest Mining Ass'n. v. Babbitt,* 5 F.Supp.2d 9, 16 (D.D.C.1998); *Southern Offshore Fishing Ass'n. v. Daley,* 995 F.Supp. 1411, 1416–17 (M.D.Fla.1998).

After initial review of the administrative record, this Court felt that the Secretary of Commerce had not fulfilled his responsibility under the law. On October 10, 1997, this Court remanded the 1997 summer flounder fishery quota and ordered the Secretary of Commerce to conduct a level of Economic Analysis consistent with the RFA and National Standard 8 of the Magnuson Act. *See North Carolina Fisheries Ass'n., Inc. v. Daley,* 16 F.Supp.2d 647 (E.D.Va.1997). On December 1, 1997, the Secretary filed with the Court a report entitled "Analysis of Economic Impacts Associated with the 1997 Summer Flounder Quota" that purportedly addressed the economic interests affected by his regulatory actions. The Court, pursuant to Rule 706 of the Federal Rules of Evidence, requested that the Plaintiffs [1] and the Secretary each name experts which the court on its motion sought to appoint. Each side recommended several possible experts; however, there was one common to each list, Dr. Charles Adams. The Plaintiffs and the Secretary each propounded written interrogatories to the expert. On July 8, 1998, Dr. Adams filed his report. Each side was allowed to brief the matter and present oral argument, and both parties agreed that all pleadings, motions and filings in this matter would be incorporated into the Administrative Record. The matter is ripe for decision.

The main issue before the court is whether the Secretary of Commerce has discharged his responsibilities under the RFA and under National Standard 8 of the Magnuson Act with regards to the requirements for undertaking an Economic Analysis. The Plaintiffs and the Secretary have renewed their cross-motions for summary judgment. For the reasons stated below, the Court GRANTS Plaintiffs' renewed motion for summary judgment and DENIES Defendant Secretary of Commerce's renewed motion for summary judgment. After review of the Secretary's so-called Economic Analysis and the independent expert's comments, the Court finds that the Secretary of Commerce acted arbitrarily and capriciously in failing to give any meaningful consideration to the economic impact of the 1997 quota regulations on North Carolina fishing communities. Instead, the Secretary has produced a so-called economic report that obviously is designed to justify a prior determination.

The Plaintiffs have also moved for the Secretary of Commerce to be held in contempt of the Court's October 10, 1997 Order that the Secretary "fix each year's fishing quota including adjustments, within a reasonable period of time." *See North Carolina Fisheries Ass'n.,* 16 F.Supp.2d at 656. The

---

1. The State of North Carolina and North Carolina Department of Environment, Health and Natural Resources filed a complaint on August 26, 1997 seeking to intervene on the side of the Plaintiff, the North Carolina Fisheries Association, Inc. and Georges Seafood, Inc. Throughout the rest of this opinion, Plaintiffs and Intervenor–Plaintiffs will be referred to collectively as "Plaintiffs" as these parties adopted each others motions, memorandums in support and responses and divided the issues between them for oral arguments.

Secretary of Commerce has failed to submit an Economic Analysis demonstrating the economic impacts of his quota regulations on small entities and on the sustained participation of North Carolina's fishing communities. Moreover, the Administrative Record in this matter clearly reveals that the Secretary utterly failed to make quota adjustments based on 1997 overages within a reasonable time period. In both respects, the Secretary and his agency have wholly neglected to follow the order of this Court and are in violation of the Magnuson Act and the RFA. Because the Secretary and his agency have not upheld their responsibilities to the Court and to Congress, the 1997 summer flounder quota must be set aside.

## I. Background

### A. *Fishery Management*

Congress granted the Secretary of Commerce "broad authority to manage and conserve coastal fisheries" by enactment of the Magnuson–Stevens Fishery Conservation and Management Act in 1976. *See Kramer v. Mosbacher*, 878 F.2d 134, 135 (4th Cir. 1989). The Magnuson Act established independent Regional Fishery Management Councils to promulgate fishery management plans ("FMPs") to regulate fishing within their regions. In the case of commercial summer flounder, the Mid–Atlantic Fishery Management Council ("MAFMC") considered the development of an FMP in the late 1970's. The National Marine Fisheries Service (the "Fisheries Service") first adopted an FMP in 1988 and, since that time, numerous amendments to the summer flounder FMP have been adopted.

Among these amendments, two are worth mentioning in more detail. In 1992, the Fisheries Service promulgated regulations to implement Amendment 2 to the FMP. 57 Fed.Reg. 57358 (Dec. 4, 1992). Amendment 2 created a rebuilding schedule for the flounder stock by requiring decreases in fishing mortality (F) each year until a maximum reduction in fishing mortality is achieved. Administrative Record ("A.R.") at 4. In 1995, MAFMC passed Amendment 7 to the FMP. Amendment 7 modifies the fishing mortality reduction schedule for Amendment 2 by calling for a fishing mortality rate of F= .23 in 1997 and thereafter. 50 C.F.R. § 648.100(a).

In furtherance of these goals, the Secretary has established an annual quota for commercial summer flounder. Through the Fisheries Service, the Secretary has established a two-step procedure for setting the annual quota in the flounder fishery. According to that procedure, the Fisheries Service sets an initial quota and a final quota for a particular year. 50 C.F.R. § 648.100(d). The quota is apportioned by percentage shares among the states of the eastern seaboard.[2] North Carolina is allocated slightly less than 27.5% of the coastwide commercial quota. 50 C.F.R. § 648.100(d)(1). In calculating the quota, the Fisheries Service utilizes a stock assessment to determine the number of summer flounder in the entire fishery. In part, the assessment is established by, among other things, relying on all reported landings for a fishing year. Significantly, current figures may not be available when the Fisheries Service begins its calculations. In that event, the Fisheries Service relies in a major way on a prior year's reported landings to determine a quota. In addition, in arriving at a quota, the Fisheries Service has generally assumed that the landings will be under-reported by approximately 30%.[3] Thus, whatever the source of the fishery landings figures, the Fisheries Service assumes that these figures are at best only 80% of the reported landing figures and at most only 50% of the actual landings.

The Fisheries Service is required by federal regulation to announce the proposed com-

---

**2.** NMFS makes a quota determination after considering the recommendations of the Summer Flounder Monitoring Committee. The Committee consists of representatives from the Atlantic States Marine Fisheries Commission, the New England Fisheries Management Council, the Mid–Atlantic Fishery Management Council, and the National Marine Fisheries Service.

**3.** The Court bases this figure on how the 1997 quota was determined. *See* Minutes of the Mid–Atlantic Fishery Management Council Meeting, September 17–19, 1997, at 6, 9, 58, A.R. at 307, 310, 359. The figure for under-reporting varies from 20% to 50%. *Id.* Thus, 30% is an approximation.

mercial quota for summer flounder by October 15th of the previous year. 50 C.F.R. § 648.100(c). If a state overfishes in any given year, federal regulations require that "overages"[4] from that year be deducted from that state's annual quota for the following year. 50 C.F.R. § 648.100(d)(2). Thus an "overage" in 1996 will result in a corresponding reduction in the 1997 quota.

### B. *1997 Commercial Summer Flounder Quota*

The commercial summer flounder quota became a subject of controversy starting back in 1995. For that year, the Fisheries Service reported that North Carolina had overfished by approximately 592,748 pounds. *See* 61 Fed.Reg. 64999 (Dec. 10, 1996). Interestingly enough, in 1994, the Fisheries Service had reported that North Carolina *under fished* by almost that same amount, or 493,023 pounds of fish. *See* Secretary's Economic Analysis ("E.A.") at 2 (Table 1). In any event, when the Fisheries Service began to formulate a quota for the 1997 year, the 1996 summer flounder figures were not immediately available. Thus, the reported figures for 1995 became highly determinative for the Fisheries Service's calculation of the 1997 quota.

On January 4, 1996, the Fisheries Service set North Carolina's 1996 initial quota at 3,049,589 pounds. A.R. at 139. On December 10, 1996, the Fisheries Service adjusted North Carolina's 1996 quota downward by 592,748 pounds based on overages from the 1995 season.[5] *See* 61 Fed.Reg. 64999; A.R. at 645. In other words, the Fisheries Service would increase the flounder fish population or stock assessment by the amount reported overfished in 1995.

On December 18, 1996, the federal government announced the initial quota for 1997, over two months after it was required to do so. A.R. at 658; *See* 50 C.F.R. § 648.100(c). Relying on this proposed quota and its meet-

ings with the federal government, North Carolina closed its fishery on January 10, 1997, only ten days after the season opened, in order to reserve 30% of its quota for its fall fishery.

The final quota for 1997 was published on March 7, 1997. *See* 62 Fed.Reg. 10473. As before, the Fisheries Service established the 1997 quota at 3,049,589 pounds. A.R. at 744. Then, pursuant to federal regulations, the Fisheries Service reduced North Carolina's quota by 1,237,149 pounds to reflect North Carolina's overages for 1996. A.R. at 744. On July 15, 1997, the Fisheries Service adjusted the 1997 quota downward based on 538,835 pounds of additional overages discovered for 1996. 62 Fed.Reg. 37741. Therefore, the final quota adjustment stood at 1,273,605.62 pounds or 59% of the original proposed quota. *See* Fed.Reg. 37741.

### C. *Procedural Safeguards of the RFA and the Magnuson Act and the Court's Order*

In managing the summer flounder fishery, the Secretary's discretion is not without limits. As reauthorized under the Sustainable Fisheries Act of 1996, 16 U.S.C. §§ 1801, et seq., the Magnuson Act commands that the Secretary determine whether the FMP is consistent both with interests aimed at promoting conservation and protecting the fishing industry. *See* 16 U.S.C. § 1854(g)(1). In that regard, the Secretary's regulatory actions must be consonant with the ten national standards calling on the Secretary to balance competing conservation and economic interests. *See* 16 U.S.C. § 1851(a).

The Secretary's authority is further limited by the Regulatory Flexibility Act, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. §§ 601, et seq. (the "RFA"), which requires administrative agencies to consider the effects of their regulatory actions on small business entities.[6] Under the RFA, an agen-

---

4. The term "overages" refers to the amount of fish landed in the fishing year that exceeds the quota assigned to the fishery.

5. North Carolina had previously had its 1996 quota reduced by 5,773 pounds which it volun-

tarily transferred to Virginia. 61 Fed.Reg. 10286 (1996).

6. "Small entities" is defined in the RFA as including small businesses, small governments,

cy that publishes a notice of proposed rule-making must prepare an initial regulatory flexibility analysis describing the effects of the proposed rule on small businesses and discussing alternatives that might minimize adverse economic consequences. *See* 5 U.S.C. § 603. When issuing a final rule, an agency must also prepare and issue a final regulatory flexibility analysis. 5 U.S.C. § 604(a). Nevertheless, the agency may choose instead to provide a certification that the final rule will not "have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b).

In this case, the Secretary issued a certification statement rather than promulgate flexibility analyses examining the effects of his regulatory actions. In the certification statement, the Secretary maintained that the regulatory measures would have "no significant economic impact on small entities." 61 Fed.Reg. 66648 (Dec. 18, 1996). As factual support, the Secretary tersely stated that the 1997 summer flounder quota was the same as the 1996 quota. *Id.*

The RFA and the Magnuson Act incorporate judicial review of the Secretary's regulatory actions pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701, et seq. ("APA"). *See* 16 U.S.C. § 1855(f); 5 U.S.C. § 611(a)(1). On October 10, 1997, this Court exercised that authority in ruling on Plaintiffs' and Defendant's original cross-motions for summary judgment. This Court held that the Secretary had failed to comply with certification requirements prescribed under § 604(a) of the RFA. *North Carolina Fisheries Ass'n.*, 16 F.Supp.2d at 653. In the Court's view, the Secretary's certification failed as a meaningful economic analysis. *North Carolina Fisheries Ass'n.*, 16 F.Supp.2d at 653. The Court further concluded that the Secretary's regulatory actions were arbitrary and capricious "in failing to give any significant consideration to the economic impact of the quota on the North Carolina fishery." *Id.* Therefore, the Secretary was directed to undertake an Economic Analysis to determine whether the adjusted 1997 quota would "have a significant impact on small entities in North Carolina." *Id.*

In addition, the Court determined that the Secretary had failed to comply with National Standard 8 of the Magnuson Act. *North Carolina Fisheries Ass'n.*, 16 F.Supp.2d at 653–654. National Standard 8 provides as follows:

> Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8).

The Court decided that the Secretary failed to harmonize his duty to rebuild overfished stocks with the mandate of National Standard 8 to "provide for the sustained participation of [North Carolina's fishing] communities." *North Carolina Fisheries Ass'n.*, 16 F.Supp.2d at 654. In his certification statement, the Secretary had claimed that the 1997 quota had not changed from the 1996 quota. *Id.* Yet Congress amended the Magnuson Act to provide for national standards after the Secretary established the 1996 quota. *Id.* Thus, the Court found that the Secretary could not rely on a quota established before imposition of National Standard 8 as evidence that he had satisfied his statutory obligation. *Id.*

Furthermore, the Court ruled that the Secretary's broad authority did not exempt him under National Standard 8 from prescribing alternatives that could, "to the extent practicable, minimize adverse economic impacts on such communities." *North Carolina Fisheries Ass'n.*, 16 F.Supp.2d at 654; *See* 16 U.S.C. § 1851(a)(8). Accordingly, the Court held that the Secretary had acted arbitrarily and capriciously in failing to comply with National Standard 8. *Id.* The Court ordered the Secretary to perform a level of

and small not-for-profit organizations. *See* 5      U.S.C. § 601(6).

Economic Analysis sufficient to comply with his statutory duty under National Standard 8 and in conjunction with his analysis under the RFA. *Id.*

Finally, the Court ordered the Secretary to "fix each year's fishing quota including adjustments, within a reasonable period of time." *North Carolina Fisheries Ass'n.*, 16 F.Supp.2d at 657. The Court explained that the Secretary's responsibility is not only to make quota determinations, but to do so in a timely fashion. According to the Court, the Secretary must provide the states with "at least a remote chance of making adjustments to their own fishery management schemes which will enable them to comply with the quota set by the federal government." *Id.* at 656.

On December 1, 1997, the Secretary filed with the Court an Economic Analysis in purported satisfaction of the statutory safeguards of the Magnuson Act and the RFA. After the Secretary's filing, the Plaintiffs and the Secretary agreed upon an economist to be appointed by the Court to help the Court evaluate the Secretary's report. Both sides also submitted proposed written interrogatories for the court-appointed expert, Dr. Charles Adams. On July 8, 1998, Dr. Adams filed a report, which responds point-by-point to the Court's questions and with respect to the adequacy of the Secretary's Economic Analysis. The Court allowed each side to brief the matter and present oral argument. In addition, each side agreed that all pleadings, motions, and other filings including some of the underlying data would be incorporated into the Administrative Record.

### D. *The 1997 Overage Adjustments*

On December 18, 1997, the Secretary issued the 1998 summer flounder commercial quota and setting North Carolina's quota at 3,049,589.[7] 62 Fed.Reg. 66304. On January 23, 1998, however, the Secretary issued a quota adjustment based on a 1997 quota overage of 181, 607 pounds of fish. 63 Fed. Reg. 3478. The Secretary's action resulted in a preliminary adjusted 1998 commercial summer flounder quota of 2,867,982 pounds. *See* 62 Fed.Reg. 6304. This action was challenged by the Plaintiffs in *North Carolina Fisheries Ass'n., Inc. v. Daley*, C.A. No. 2:98cv213, on the ground that the Secretary has failed to issue quota regulations, including adjustments, within a reasonable period of time in violation of the Magnuson Act and the RFA and pursuant to the Court's October 10, 1997 order.

On April 28, 1998, almost five months into the year, the Secretary issued another adjustment based on a 1997 quota overage of 218, 133 pounds. 63 Fed.Reg. 23227. For the year, the reductions amounted to a total of 399, 740 pounds of overages for 1997. Thus, the quota adjustments set the 1998 quota at 2, 649, 849 pounds. The Secretary's April 23, 1998 quota adjustment was challenged by the Plaintiffs in *North Carolina Fisheries Assn., Inc. v. Daley*, C.A. No. 2:98cv606, on similar grounds that the Secretary has failed to issue quota regulations, including adjustments, within a reasonable period of time in violation of the Magnuson Act and the RFA and pursuant to the Court's October 10, 1997 order.

The Secretary has justified the April 23, 1998 quota adjustment on the ground that North Carolina reported 37, 000 pounds of summer flounder landings from non-federally permitted dealers in March 1998. However, the affidavit of Gregory R. Power, the Chief of the Fishery Information Section of the Northeast Office of Fisheries Statistics for the Fisheries Service, states that North Carolina made the Secretary aware of these landings as early as February 17, 1998. In addition, the Secretary has argued that additional landings were reported for North Carolina as a result of law enforcement actions, and he provides a notice of violation filed against Gillikin Seafood, Inc. ("Gillikin") and James T. Gillikin. The affidavit of Gregory R. Power states that Gillikin underreported 181, 900 pounds of fish dating back to January 1997. The Court's own examination of

---

**7.** On October 20, 1997, the Fisheries Service published findings for the 1998 stock assessment, which indicates that the overall amount of the flounder stock has been underestimated. In-

deed, the reported findings suggest that the scientific evidence may have miscalculated the fishing mortality of the flounder stock. *See* Fed.Reg. 54427 (Oct. 20, 1997).

the counts against Gillikin discloses that Gillikin under-reported 188, 806 pounds of fish. Using the Court's figures, the additional landings are in the amount of 225, 806 pounds (188, 806 plus 37, 000).

The Administrative Record [8] in this matter clearly shows that the Secretary understood the nature of the Gillikin under-reporting investigation way back in April 1997. The Administrative Record also suggests that the Secretary may have set the 1998 commercial flounder quota in December 1997 with the Gillikin figures in mind. More specifically, on April 16, 1997, North Carolina Marine Patrol Officer Jim Kelly tipped off Special Agent Jeff Radonski of the Fisheries Service concerning possible violations by Gillikin that took place between January 1, 1997 and January 10, 1997. Special Agent Radonski and other agents executed an inspection warrant on Gillikin property on June 25, 1997. After inspecting the property, Fisheries Service agents compiled trip reports for 15 vessels, which specifically included a trip report for James T. Gillikin for the dates January 4, 1997 through January 10, 1997. On December 5, 1997, Special Agent Radonski filed a report on the Gillikin investigation, which documented the civil violations for failing to report or reporting late the precise amount of summer flounder landings.

Inexplicably, even though the Gillikin investigation commenced in April of 1997, Fisheries Service employees responsible for setting a commercial flounder quota for North Carolina never inquired about the amount of unreported landings until much later. Beginning in November of 1997, those Fisheries Service employees began discussing the need to obtain those figures:

> [I]n order to complete our 1997 data for quota managed species we need to have in our hands the documentation from this case [Gillikin] as well as any others pending. *We have already added some 80,- 000# into the quota system from the North Carolina case.* However, there may be data from other problem areas yet to come as well as additional data from North Carolina. *We are working with GCNE and enforcement to try to meet a mid-December deadline to deliver reasonable preliminary numbers.* This is mostly relevant for summer flounder but is also for fist winter period of scup. (emphasis added)

November 18, 1997 e-mail communication from Gregory Power, Fisheries Service, to Kevin Dufficy, Hannah Goodale, Regina Spallone, Peter Colosi, Eugene Steady, Charles Yustin, Gino Moro and Pat Kurkul.

Apparently, when the 1998 commercial flounder quota was set in December, the agency had already factored in 80, 000 pounds of fish to represent the Gillikin figures.[9] And yet, those responsible in the agency for establishing a North Carolina quota had not confirmed, nor had they made any reasonable attempt to confirm, the number of unreported landings by Gillikin, although the material had been available as early as July by the enforcement portion of the agency.

By January of 1998, however, the Secretary planned to go public with the Gillikin investigation. He scheduled a press release for January 15, 1998 outlining the civil violations and fines against Gillikin. One day prior to the Secretary's press release, the Fisheries Service employees awoke and started making initial inquiries to their Law Enforcement section with respect to the Gillikin figures.

> We're coming under pressure to try to finalize North Carolina summer flounder landings.... Now that this [Gillikin investigation] has gone public through a press release, would it be possible to obtain copies of any documentation Enforcement might have?

---

8. The Court ordered *in camera* review of documents relating to the Gillikin investigation. Among the documents discovered were the file of Special Agent Jeff Radonski of the Fisheries Service, and the file of Senior Attorney Charles Juliand of the National Oceanic and Atmospheric Administration. By stipulated order, all the documents have been incorporated into the Administrative Record.

9. In establishing the stock assessment of flounder, the agency would have considered that the total figures of landings would be under reported by some 30%. *See* Footnote 3.

January 14, 1998 e-mail communication from Eugene Steady of the Fisheries Service to Special Agent Jeff Radonski of the Fisheries Service.

In the aftermath of public disclosure of the Gillikin investigation, the Secretary announced an additional quota adjustment on April 28, 1998. Apparently, however, the Secretary had already taken into account Gillikin's unreported landings and issued the 1998 quota on the assumption that Gillikin's under-reporting represented 80, 000 pounds of fish. Thus, the 80,000 pounds apparently was not even considered in setting the penalty adjustment in April. Throughout the investigation, the Secretary's designees in charge of setting the quota acted sluggishly and failed to confirm from their own colleagues in Law Enforcement what the actual Gillikin figures were. Yet when the Secretary issued a press release, these bureaucrats responded with unusual alacrity.

## II. Analysis

### A. *Standard of Review*

■ The issues before the Court are whether the Secretary of Commerce has upheld his responsibilities under the Magnuson Act and the RFA and conducted a sufficient level of Economic Analysis, and whether the Secretary has issued 1997 quota overage adjustments within a reasonable period of time. *See Fishermen's Dock Cooperative, Inc. v. Brown,* 75 F.3d 164, 167–68 (4th Cir.1996). As mentioned above, the Regulatory Flexibility Act, 5 U.S.C. § 611, and the Magnuson–Stevens Act, 16 U.S.C. § 1855(f), provide for judicial review of agency actions. Agency actions under both statutes are to be reviewed for compliance in accordance with the "arbitrary and capricious" standard under the Administrative Procedure Act, 5 U.S.C. § 701, et seq. *See* Regulatory Flexibility Act, 5 U.S.C. § 611(a)(2); ·Magnuson–Stevens Act, 16 U.S.C. § 1855(f)(1).

More specifically, the Administrative Procedure Act (APA) states that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A). Interpreting these terms, the United States Court of Appeals for the First Circuit has held that under the RFA, the Secretary's judgments are not arbitrary and capricious if he "made a reasonable, good faith effort to canvass major options and weigh their probable effects." *See Associated Fisheries of Maine v. Daley,* 127 F.3d 104, 116 (1st Cir.1997).

### B. *The Secretary's Economic Analysis and the RFA*

The Court directed the Secretary to conduct a level of Economic Analysis pursuant to the RFA's requirement that an agency consider whether a regulation has a "significant impact" on small entities in North Carolina. *See* 5 U.S.C. §§ 601, et seq. In performing that Analysis, the Secretary utilized criteria employed internally by the Fisheries Service in evaluating the economic impacts of regulations under the RFA. *See Guidelines on Regulatory Analysis of Fishery Management Actions,* at 14. Thus, the Secretary considered the following criteria:

Criteria 1: Does the action result in revenue loss of more than 5 percent for 20 percent or more of the participants?

—

Criteria 3: Does the action result in 2 percent of the entities ceasing operations?

Based on the Fisheries Service's internal guidelines, the Secretary found that there would be no significant economic impact on a substantial number of small businesses arising from the 1997 summer flounder quota. *See* Economic Analysis ("E.A.") at 24–26. In making this determination, the Economic Analysis used the total number of vessels issued moratorium permits [10] as "the universe for the evaluation of impacts." E.A. at

---

**10.** The summer flounder FMP established a moratorium on entry of additional commercial vessels into the summer flounder fishery. Vessels with documented landings between 1985 and 1990, however, qualified for moratorium permits allowing them to land and sell summer flounder under the moratorium program. Thus, any person who had even landed summer flounder would apply for and retain a permit, so that if they ever wished to fish for summer flounder in the future they would have a permit.

3. Moreover, the "small entities" or communities he studied constituted the whole state of North Carolina. Examining the unadjusted 1997 quota first, the Economic Analysis determined it "possible" that criteria 1 would be triggered by reducing the income of more than 20% of the entire North Carolina fleet by more than 5%. E.A. at 24–5.

The Economic Analysis next considered the Fisheries Service's criteria under the initial 1997 quota adjustment. Under the adjustment, the Economic Analysis determined that 57% of the vessels with home ports in North Carolina are projected to have revenue reductions of greater than 5%. E.A. at 25. The Economic Analysis further maintained that an additional 43% of North Carolina's flounder fleet may have reduced revenues by 25% or more. *Id.* at 25. Despite this assessment, the Economic Analysis concluded that there were no significant economic impacts. Incredibly, the Economic Analysis asserted that any adverse effects arising from the initial 1997 quota adjustment were offset by previous revenues the fishermen had earned from overfishing.[11] *Id.* at 25.

The Economic Analysis then examined the final 1997 quota adjustment and concluded that under the adjustment, 19.1% of all fishery participants will experience revenue reductions by 5% or more. E.A. at 25. The Economic Analysis conceded that such reductions approach the level of criteria 1. Additionally, the Economic Analysis admitted that criteria 3 was triggered because 3.6% of all fishery vessels could have their revenues reduced by 50% or more. E.A. at 25–6. Nonetheless, the Economic Analysis concluded that there had been no significant economic

impacts on small entities in North Carolina. *Id.* at 25–6. As before, the Economic Analysis alleged that past revenues earned by North Carolina's fishermen in excess of their quota mitigate present economic impacts. *Id.* at 26.

In view of the Secretary's Economic Analysis, the Court concludes that the Secretary prepared an Economic Analysis utterly lacking in compliance with the requirements of the RFA. In the first place, the Secretary did not consider a community any smaller than the entire state of North Carolina. In the second place, the Secretary completely ignored readily available data, which would have shown the number of fishing vessels impacted by the agency's regulatory actions.[12] In the Economic Analysis, the Secretary used the total number of fishing vessels issued flounder permits as the yardstick for determining economic impacts. E.A. at 3. (*See* Footnote 10) By doing so, the Secretary has disregarded the simple distinction between a license-holder and a fisherman who actually fishes for flounder. According to the Economic Analysis, 1,086 fishermen were issued commercial flounder permits for the year 1996. E.A. at 3. (*See* Footnote 10).

The agency's use of moratorium permits as the "universe" of participants in the summer flounder fishery amounts to willful blindness. The internal files of Dr. Philip Logan,[13] the principal preparer of the Economic Analysis and a Fisheries Service employee, demonstrate that the Secretary's designees well-understood that relying on permit data would over-represent the number of participants in the flounder fishery. Among the materials,

11. As an initial matter, the figures provided in the Economic Analysis itself demonstrate the patent falsity of such a contention. North Carolina overfished in 1995 by some 592, 748 pounds of fish, which resulted in a penalty for the 1997 year. However, the Economic Analysis also shows that North Carolina under fished in 1994 by 493, 023 pounds. *See* E.A. at 2 (Table 1). Thus, the final penalty resulting from the 1995 overfishing is substantially similar to the amount reported under fished in 1994. It only seems logical that if overfishing results in greater revenues in a single year, then under fishing results in less revenue. However, the reasoning itself on an economic or social basis is absurd. Ask anyone whose income is reduced from one year to

the next by over 10% whether it resulted in any economic effect.

12. Moreover, there were only gross revenue projections without regard to any fixed or even variable costs. As in most agencies, profit and loss is not a consideration in the Secretary's own budget so there is little or no basic understanding of fixed or variable costs or net or gross profit.

13. On July 18, 1998, the Court ordered production of any materials relied on by Dr. Logan in preparing the Secretary's Economic Analysis. By stipulated order, these documents have become part of the Administrative Record.

there is an e-mail message addressed to Dr. Logan and other Fisheries Services employees with a heading that reads, "1996 Fluke Permit Data," and with the following attachment:

> It should be kept in mind that at any one time one half to two thirds of permits for a particular fishery are not being actively fished. *Only 808 vessels, for instance, actually landed summer flounder in 1996 though 1,696 vessels held permits (1086 commercial and 646 party/charter), with 36 vessels double counted due to holding both permit categories of permit.* (emphasis added)

November 14, 1997 e-mail with attachment to Hannah F. Goodale, Regina L. Spallone, Joel G. MacDonald, Philip Logan, and Barbara Rountree.

Judging by this correspondence, the Secretary's designees consciously ignored the Fisheries Service's own data and selected a flawed methodology. Moreover, the correspondence shows that if the number of vessels actually landing flounder included "charter" boats, then the economic analysis would be further skewed against the fishermen. For charter boats are those carrying anglers who catch and land a few fish, while commercial fishermen catch and land thousands of fish. But under any "objective" analysis, the economic effects are devastating if not ruinous.

Indeed, the Secretary's own scientific evidence shows that the actual number of participants in the summer flounder fishery for the year 1996 was 616 commercial vessels. According to records obtained by the Plaintiffs under the Freedom of Information Act, National Fisheries Science Center documents relied upon by the Secretary in drafting tables 3 and 4 of the Analysis show that of the 1,086 commercial summer flounder licensees, 470 of those fishermen had no flounder landings. *See* E.A. at 5–6. Thus, according to the figures furnished the Plaintiffs, 616 commercial vessels (1086 – 470) landed summer flounder for the year 1996.[14]

14. At most, then, 808 vessels including charter boats landed flounder. The probable number of commercial boats is more likely 616 vessels, yet

■ Overall, the Secretary's own compiled data is contradictory and confounding. Based on their own information, however, the designees of the Secretary were well-informed that approximately one-half of permitted vessels actually land summer flounder. For criteria 1 of the Fisheries Services guidelines to be triggered, the Secretary's regulatory action must result in revenue loss of more than 5% for 20% or more of the participants. The Secretary's designees presumably understood that if examined by the total number of permit holders, rather than actual fishermen, satisfaction of criteria 1 might be remotely possible. The Secretary has considerable discretion to act on the basis of less than perfect information. However, the Secretary and his subordinates have no right to omit known information to them in order to skew the results. *See Commonwealth of Massachusetts v. Daley*, 10 F.Supp.2d 74, 76 (D.Mass.1998).

In that regard, the Secretary has obscured the findings in his Economic Analysis in order to try and justify an untenable position. The Secretary's Analysis admits that under the unadjusted 1997 quota, criteria 1 of the Fisheries Services guidelines may be triggered even with skewed figures. E.A. at 24–5. Furthermore, the Economic Analysis acknowledges significant revenue reductions for North Carolina fishermen under the initial 1997 quota and under the final 1997 quota. In fact, the Economic Analysis concedes that under the final 1997 quota, criteria 3 is triggered under the NMFS guidelines even with skewed figures. E.A. at 25–6.

Nonetheless, the Secretary soft-pedals around the documented results and argues that small business entities suffer no significant impacts. Among the arguments, the Secretary maintains that any present economic losses are alleviated by past revenues earned by overfishing. E.A. at 26; *see* Footnote 11 (in order to entertain such a proposition one must ignore the under fishing). In that respect, the Economic Analysis construed this to be an argument in favor of

the Court's search of the Administrative Record furnished by the compiler of the Analysis did not clearly show this figure.

noncompliance with NMFS guidelines. E.A. at 26. In the Court's view, the Secretary's contention is without any foundation. In fact, Dr. Charles Adams, the economist selected by the Secretary to examine his report, referred to the Secretary's assertion as "totally inappropriate" and "irrelevant". *See* Report of Dr. Adams, Answer to Question 21 ("Adams Report at Q.____"). Dr. Adams explained that empirical results of analyses are rendered meaningless by claims that past revenues are offset by current losses. *See id.*

■ The Secretary's conscious refusal to recognize the economic impacts of his regulatory actions calls into question the agency's willingness to consider less severe alternatives. In their brief, the agency contends that the Secretary is under no statutory duty to consider alternatives. Yet statutory construction and a modicum of practical judgment must compel a different conclusion. Section 605 of the RFA allows the Secretary to make a certification and thereby avoid the provisions of Section 604 for the preparation of flexibility analyses. *See* 5 U.S.C. § 605. Section 604(a)(5) of the RFA requires an agency issuing flexibility analyses to describe the steps taken to minimize significant impacts through less drastic alternatives. 5 U.S.C. § 604(a)(5). Essentially, the Secretary argues that whenever the agency elects to certify its regulatory action, the agency has a green light not to consider alternative ways to minimize economic impacts as provided under Section 604(a)(5). Surely, Congress has not intended for administrative agencies to circumvent the fundamental purposes of the RFA by invocation of the certification provision. If, however, the Secretary's position is correct, he could certify no economic effects when every commercial fisherman in the state is in bankruptcy.

## C. The Secretary's Economic Analysis and the Magnuson Act

■ The Court also directed the Secretary to conduct a level of Economic Analysis consistent with his obligations under National Standard 8 of the Magnuson Act. National Standard 8 mandates that the Secretary's regulatory measures "provide for the sustained participation of [fishing] communities, and [ ] to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8).

The Secretary has undertaken an Economic Analysis and concludes that the agency has complied with National Standard 8. In the Analysis, the Secretary used the number of North Carolina fishing vessels identified by principal port, home port or residence as the sole basis for determining adverse effects on North Carolina's fishing communities.[15] Moreover, he considered the entire state of North Carolina as one fishing community. Under the initial 1997 quota, the Economic Analysis found that the North Carolina quota suffered a 50% reduction. E.A. at 5. Whether by home port or by principal port, even the Economic Analysis stated that 55% of the North Carolina vessels were impacted by 5% or more. E.A. at 27. Moreover, even the Economic Analysis projected that 43% of the North Carolina vessels would experience revenue reductions of more than 25%. E.A. at 7.

Against the weight of this empirical information, the Economic Analysis nevertheless maintained that the 1997 quota regulations posed no threat to the sustained participation of North Carolina's fishing communities. The Economic Analysis surmised that North Carolina's fishing vessels are broadly disseminated. From that supposition, the Economic Analysis inferred that adverse impacts are widely dispersed among fishing communities.[16] Therefore, even though vessels' reve-

---

**15.** The annual vessel permit applications require a mailing address that identifies an applicant's state of residence. The Economic Analysis refers to this as a vessel's home port. On their application, vessel owners are also to identify the vessel's principal state of landing. The Economic Analysis refers to this as vessel's principal port. *See* E.A. at 3.

**16.** In examining the vessels by city or town of residence, the Economic Analysis concluded that no community with more than 8 vessels is impacted. If by home port, the Economic Analysis concluded that no community with more than 7 vessels is impacted. If by principal port, the Economic Analysis states that sixteen ships in Beaufort, North Carolina are impacted. Besides that town, the Economic Analysis states that no

nue reductions are between 5% and 60%, the Economic Analysis surmised that there is no economic threat posed by the quota regulations. E.A. at 29.

The Economic Analysis arrived at the same conclusion upon examination of economic interests under the July 1997 quota adjustment. The report found that the regulatory adjustment removes 70% of the North Carolina summer flounder quota. E.A. at 9. The empirical data also demonstrates that the majority of impacted vessels are from North Carolina. According to the Economic Analysis, the number of North Carolina vessels projected to suffer a loss of gross revenues of 50% or more doubled from 21 to 39 vessels. E.A. at 10–11. This represents 34% of the North Carolina fleet holding a license. E.A. at 10–11. Again, in the face of mounting evidence, the Economic Analysis asserts that fishing communities are not adversely impacted because vessels are scattered widely.[17]

After reviewing the Secretary's Analysis, this Court finds that the Secretary has completely abdicated his responsibilities under the Magnuson Act. In the report, the Secretary's narrow methodology ignores every relevant fact except where North Carolina's fishing vessels are located. It gives no consideration to the population size of communities, the significance of the fishing industry on local economies, or to what even constitutes a fishing community. On top of that, the Secretary completely departs from his own empirical findings. He then justifies that departure with remarks that are an affront to one's native intelligence. As a final insult, the Secretary stubbornly argues that legal constraints posed by his own regulations override his clear statutory duty under National Standard 8 to minimize adverse economic impacts on communities.

First of all, the Secretary's examination failed to take into account the population size of particular fishing communities. Dr. Adams, the economist selected by the Secretary, criticized the Analysis for omitting this empirical data. See Adams Report at Q .14. To be certain, without demographic information, the number of vessels impacted by the Secretary's actions is meaningless for determining adverse impacts on communities. For example, forty-eight (48) of the vessels impacted by more than 5% are from eight North Carolina communities identified in the National Standard 8 analysis.[18] See E.A. at 27–31. Those vessels are from Atlantic (Carteret County), Beaufort (Beaufort County), Belhaven (Beaufort County), Grantsboro (Pamlico County), Lowland (Pamlico County), Oriental (Pamlico County), Vandemere (Pamlico County), and Wanchese (Dare County). The 1990 United States Census figures show the following populations for four of the eight communities: Beaufort, 3,808; Belhaven, 2,269; Oriental, 786; and Vandemere, 315. See U.S. Department of Commerce, Estimates of the Population of Places: Annual Time Series, July 1, 1991 to July 1, 1996 (SU–96–7). As a comparison, under the final quota adjustment, vessels affected by 5% or more are as follows: Beaufort, 16 vessels; Belhaven, 7 vessels; Oriental, 7 vessels; and Vandemere, 7 vessels.[19] See E.A. at 29–30. For the so-called analysis to indicate that Vandemere, a village of 315

community with more than 9 ships is impacted. See E.A. at 28.

17. By city or town of residence, the Economic Analysis alleged that no more than 8 vessels were located in a North Carolina community. By home port, the Economic Analysis claimed that no more than 7 vessels are in any one community. And by principal port, the Economic Analysis maintained that no more than 16 vessels are in any one fishing community. E.A. at 30.

18. The Court notes that the Economic Analysis made no examination as to where the vessels suffering the greatest economic impacts are located, even though the database would seem to permit such an inquiry. Thus, there is no way of determining what percentage of those vessels are located in the fishing villages of North Carolina.

19. As noted before, the Economic Analysis lists vessels by principal port, home port, or by residence. This Court, however, has listed vessels by principal port where such information is known, since the principal port is the place where vessels travel in and out of, and where landings are made. Thus, the Court has listed the vessels affected in Beaufort, Oriental, and Vandemere by principal port. Since vessels in Belhaven are not listed in the Economic Analysis by principal port, the Court has listed them by town or residence. See E.A. at 30.

people, is not impacted by the loss of revenue of 7 vessels is insulting to the intelligence of anyone supposedly analyzing economic effects on communities. The other four communities listed are unincorporated villages and, because each village is so small, census data on them is unavailable. Apparently then, the results are staggering under the final quota adjustment: Lowland, 6 vessels; Atlantic, 6 vessels; Grantsboro, 5 vessels; and Wanchese, which is a larger community than Lowland, Atlantis, and Grantsboro combined, had 10 vessels.[20] *See* E.A. at 30.

On top of this, the Secretary failed to take into account supporting empirical information tending to show the importance of the fishing industry to the local economies of selected communities. In his report, Dr. Adams, the independent expert selected by the Secretary, agrees that the seafood industry must be considered in assessing the economic impacts on affected communities. According to Dr. Adams, the Analysis should have examined potential effects on processors, wholesalers, distributors, boat yards, gear shops, ice houses and other fishery-dependent industries. Adams Report at Q. 21. Without that information, Dr. Adams was concerned that there was no proper way of measuring the industry's "percentage contribution to the personal income of the affected [communities]." Adams Report at Q. 14.

In that sense, Dr. Adams believed that the Economic Analysis is deficient for not taking an expansive view of what constitutes a "fishing community" in North Carolina. By assuming a narrow definition, the Economic Analysis does not address communities' longstanding involvement in the fishing industry. The Economic Analysis has no way of measuring the sustained participation in, or the dependence of, communities on fisheries. Significantly, the Magnuson Act does envision such a broad-based definition of "fishing community":

The term "fishing community" means a community which is substantially dependent on or substantially engaged in the harvest or processing of fishery resources to meet social and economic needs, and includes fishing vessel owners, operators, and crew and United States fish processors that are based in such community.

16 U.S.C. § 1802(16).

In light of the Magnuson Act's own definition, an analysis of impacts on fishing communities should have been grounded in a geographical context.[21] In Dr. Adams' view, fishing communities are better defined on a county-by-county basis in order to capture "the economic impacts of the quota changes at the 'community' level." Adams Report at Q. 8. As an example, Dr. Adams pointed out that the analysis could have scrutinized the cluster of towns and villages in Pamlico County, which include Lowland, Oriental, Grantsboro, and Vandemere. Adams Report at Q. 3. In their brief, the Plaintiffs examined the 1997 quota's economic impact on Pamlico County. United States Census figures show that in 1990, Pamlico County had a population of 11,372. The Census figures estimate that for 1996, Pamlico County's population is 11,972. *See* U.S. Department of Commerce, Estimates of the Population of Places: Annual Time Series, July 1, 1991 to July 1, 1996 (SU–96–7). Among the most impacted vessels, twenty-four are located in Pamlico County. In addition, the three largest manufacturers in the county are fish seafood processors with a combined workforce of 230. Among the 296 manufacturing jobs in the county, 244, or 82% are based in the seafood industry. *See* Plaintiffs' Memorandum Objecting to the Economic Analysis, at 10–13. Based on this empirical evidence, Pamlico County would seem to be a "fishing community" whose sustained participation in fishing is threatened by the impact of 1997 quota reductions in summer flounder.

---

20. The vessels affected in Wanchese and Lowland are listed in by principal port. Because the vessels in Atlantic and Grantsboro are not listed by principal port in the Economic Analysis, the Court has identified them by place of residence. *See* E.A. at 30.

21. When defined this way, the Secretary's assertion that the wide dispersal of vessels ameliorates the impacts on North Carolina's communities is questionable. Dr. Adams comments that "[i]n fact, the vessels impacted in North Carolina are basically located in a few coastal counties." *See* Adams Report at Q. 8.

Ironically enough, the Secretary has shown that such empirical data may be compiled and examined by virtue of an attachment to his Analysis that spotlights Wanchese, North Carolina in the early 1990's. *See* E.A. at 41–59. In the attachment to his report, the Secretary's findings illustrate Wanchese's long-standing involvement in the fishing industry. The Secretary states that Wanchese fishermen have been depicted as " 'small, independent operators who generally own their own boats and gear and spend long, hard hours on the water.' " E.A. at 45. As the Secretary has found, approximately half of the men in Wanchese are in a marine-related career. Given the level of male participation, the Secretary surmised that "most of the residents of Wanchese are connected in some way to the fishing industry." E.A. at 45. The Secretary also targeted specific species of fish and showed their economic importance to the residents of Wanchese. In 1992, for instance, summer flounder was 40.81% of the total landed value and therefore represented the most valuable species of fish to Wanchese residents. E.A. at 49. Yet the Secretary also noted that the number of commercial fishing boats declined substantially from the 1970's to the 1990's, from a conservative figure of 40 to 50 vessels to 20 or 30 vessels. E.A. at 52.

The Secretary may not bury his findings on Wanchese, North Carolina by merely appending them to his report. If anything, the Secretary's own detailed analysis of Wanchese underscores the importance of collecting and analyzing data on a local level. In fact, one Fisheries Services employee recognized this need and highlighted the serious deficiencies of the Analysis if such information were omitted:

> With regard to Section 2, National Standard 8 analysis, I am very concerned that the analysis does not address the relative size of the communities or their geographic isolation due to the coastal/inland swamps (pocosins) and wetland forests. Both have a bearing on sustained participation in and dependence on the fishery. . . . The North Carolina tradition of community—and—kin involvement in fisheries, even ones where the vessel works from the ports of other states for long periods of time, is an important cultural and employment element. *In my opinion, dependence of communities on these activities and earnings is not clearly shown in the analysis provided.* (emphasis added)

November 26, 1997 e-mail from Mark Millikin to Hannah Goodale (file of Dr. Philip Logan).

Ultimately, however, the Secretary's designees did not utilize data that would have assisted the Secretary in making an informed judgment on adverse economic impacts. Rather, they limited their inquiry to the number of vessels in a particular port or residence. By that intentional act, the Secretary's designees foreclosed any meaningful examination of economic impacts and any possibility of reasonable compliance with National Standard 8.

In his own defense, the Secretary argues that requiring the agency to collect and analyze detailed information of the kind requested would place an "undue burden" on agency resources. According to the Secretary, the agency can not consider every hamlet situated along the eastern seaboard. Nonetheless, the Court must deem the Secretary's contentions to be unacceptable because they are simply untrue. With the advent of the Internet, the burden on administrative agencies to collect data of this kind is considerably lessened. If the Secretary's designees wished to collect population figures, for instance, a simple search on the Internet would have provided that information through the website of the United States Census Bureau.[22] Certainly, the Secretary need not consider every fishing community remotely affected by his quota regulations. Yet where an examination is warranted, the Court has no authority to waive the Secretary's obligations under the Act.

The Secretary's responsibilities include undertaking a reasonable examination of his own empirical findings. The Secretary may

---

22. This Court's chambers conducted its own Internet search and located the pertinent census data within a short period of time.

not turn a blind eye to the mounting statistical evidence his own agency has compiled. Under the initial 1997 quota, the Secretary's Economic Analysis showed that over half of North Carolina vessels are impacted by 5% or more. E.A. at 7. The Analysis found that 43% of the vessels suffer revenue reductions of more than 25%. *Id.* Under the July 1997 Quota Adjustment, the percentages are more alarming. The Analysis determined that at least one-third of North Carolina vessels are projected to suffer a loss of revenue of 50% or more. E.A. at 11. In addition, an overwhelming percentage of vessels, 82%, are impacted by 25% or more. E.A. at 9–10 (Comparing Tables 7 & 8).

Incredibly, through the Economic Analysis and subsequent submissions, the Secretary's designees desperately seek to sidestep their own statistical findings. For example, the Economic Analysis shows that under the July 1997 quota adjustment, 18% of North Carolina's vessels will have gross revenues reduced by 50% or more. Yet, without citation or reference, the Economic Analysis makes assurances that "losses of at least that magnitude (50% or more) are thought necessary to result in business failure." *See* E.A. at 25. Not surprisingly, Dr. Adams, the economist selected by the Secretary, was unwilling to endorse this view: "My feeling is that losses less than 50% could result in business failure." Adams Report at Q. 12.

Maybe in light of Dr. Adams' comments, the Secretary's designees now admit that a revenue loss of less than 50% could result in business failure. The subordinates further acknowledge that vessels carrying substantial debts are more susceptible to bankruptcy if suffering slight revenue reductions. Nonetheless, the designees vigorously defend the Economic Analysis and its underlying suppositions. In their mind, "Vessel[s] with little or no debt will be substantially more resilient to bankruptcy and may be able to withstand significant revenue losses for at least a period of time." *See* Defendant's Answers to Dr. Adams' Report, at 10–11. Unfortunately, the Secretary's designees provide no meaningful figures on vessels' profit margins. Thus, the Secretary and this Court have no way of knowing how "resilient to bankruptcy" North Carolina fishing vessels might be.

Finally, the Secretary has failed to issue regulatory measures that, "to the extent practicable, minimize adverse economic impacts on [fishing communities]." *See* 16 U.S.C. § 1851(a)(8). The Economic Analysis cites to the Secretary's own regulatory requirements for the proposition that the commercial quota "was the maximum allowed under the law." E.A. at 31. More specifically, the Economic Analysis claimed that the Secretary's own regulations specified that the 1997 commercial quota could not exceed 18,518,830 pounds unless the associated fishing mortality rate (F) was 0.23. *See* 50 C.F.R. § 648.100(a). The Secretary asserts that the stock assessment that reviewed the summer flounder stock in 1997 indicated the improbability of achieving a mortality rate of $F = 0.23$ with a quota in excess of the amount specified. In addition, the Economic Analysis maintained that the Secretary was constrained by federal regulations specifying North Carolina's allocated share of the commercial quota. *See* 50 C.F.R. § 648.100(d)(1). Moreover, the Economic Analysis stated that regulatory measures required the Secretary to make quota deductions in the following year where the landings in the previous year are in excess of the quota. *See* 50 C.F.R. § 648(d)(2).

Still, the 1998 stock assessment calls into question whether the Secretary's efforts at statutory compliance would even be exceeding his own regulatory requirements. As promulgated, the 1998 stock assessment suggests that the fishing mortality rate for 1994 and 1995 has been overestimated. In turn, that finding suggests that the summer flounder stock may be underestimated by a significant degree. *See* 62 Fed.Reg. 54427 (Oct. 20, 1997).

■ In any case, the Secretary is mistaken in the belief that his own regulatory requirements override the statutory provisions under National Standard 8. Legal constraints on the Secretary's decision making emanate from the statute, not from the agency's own regulations. As a rejoinder, the Secretary maintains that his regulations conform to the goals of the Magnuson Act "to rebuild overf-

ished fisheries, and to achieve the optimum yield from each fishery." Federal Defendant's Renewed Motion, at 17. Even so, the purposes of National Standard 8 do not concern fishery conservation in isolation. To the contrary, the express terms of National Standard 8 provide for a balancing of conservation interests against the economic rights of commercial fishermen and fishing communities. *See* 16 U.S.C. § 1851(a)(8).

### D. *Remedy under the RFA and Magnuson Act*

■ The Court has considerable latitude to fashion an appropriate remedy in this action. The Regulatory Flexibility Act expressly authorizes "corrective action" "including but not limited to—(A) remanding the rule to the agency, and (B) deferring the enforcement of the rule against small entities unless the court finds that continued enforcement of the rule is in the public interest." *See* 5 U.S.C. § 611(a)(4). The Magnuson Act expressly authorizes a court to "set aside" a regulation or agency action. *See* 16 U.S.C. § 1855(f); *see also Commonwealth of Massachusetts,* 10 F.Supp.2d 74, 79 (voiding portion of National Marine Fisheries Service regulation deemed arbitrary and capricious under National Standard 4 of the Magnuson Act). In the present case, the Secretary has acted arbitrarily and capriciously in failing to make a good faith attempt at conducting an Economic Analysis as mandated under the RFA and the Magnuson Act.

In addition, the Secretary's abject failure to set North Carolina's 1997 overage adjustments within a reasonable time period runs afoul of the Magnuson Act and the RFA and is in violation of this Court's October 10, 1997 Order. The enforcement wing of the Fisheries Service launched an investigation of Gillikin beginning in April of 1997. Those responsible for setting a commercial flounder quota for North Carolina should have inquired of their colleagues in enforcement and

confirmed the exact amount of under-reporting.

When the Secretary set the 1998 commercial quota on December 18, 1997, those responsible still had not confirmed those figures. Evidently, the Secretary included 80,000 pounds of overages in the 1998 quota as a rough approximation of Gillikin's unreported landings. *See* 62 Fed.Reg. 66304. This approximation was made even though the figures were in the hands of the agency's enforcement section as early as July. The Administrative Record shows that only the Secretary's press release on the Gillikin investigation in January spurred those responsible for the quota to make inquiries of their co-employees. Even then, the Secretary issued an adjustment based on a 1997 overage on January 23, 1998 without including the actual Gillikin figures. *See* 63 Fed. Reg. 3478. Finally, on April 28, 1998, the Secretary issued a second adjustment based on a 1997 overage, which included the full amount of the Gillikin landings and seems to be in addition to the 80,000 pounds reflected in the initial 1998 quota. *See* 63 Fed.Reg. 23227. Thus, this seems to be a case of double-counting the 80,000 pounds.

The Secretary's responsibilities are not only to establish quota regulations but to do so in an honest and timely manner. Otherwise, North Carolina and other states have no chance at all to comply with the Secretary's Fishery Management scheme and are penalized economically for the Secretary's own failings.[23] That has happened here. The Fisheries Service dragged their feet and did not confirm the amount of under-reporting by Gillikin until a reasonable time had long since passed. The North Carolina fishermen should not be held responsible for the Secretary's own institutional failings.

The Secretary's non-compliance with the Court's original order places the Court in a difficult position. The Court has already remanded the 1997 quota regulations back to

---

**23.** The Court notes that at oral argument, the Secretary asserted that Fisheries Service employees responsible for setting the quota adjustments had no knowledge of the Gillikin figures because the Law Enforcement section was handling the investigation. In this respect, the Secretary contends that his "left hand" did not know what his "right hand" was doing. All the same, that may only shield the Secretary and his designees from personal contempt of the Court's October 10, 1997 Order.

the Secretary once and, in the interests of justice, the Court is reluctant to remand the quota once again. Moreover, the Secretary's actions have been in clear violation of the Magnuson Act and the RFA. The Secretary's authority to set quotas should serve as a regulatory guidepost for the conservation of the fishery. It should not be used as a buzzsaw to mow down whole fishing communities in order to save some fish. The Magnuson Act and the RFA were specifically enacted to avoid such a situation from happening.

In sum, the Secretary's Economic Analysis is in violation of the Magnuson Act and the RFA and this Court's prior order. The Secretary's quota adjustment based on 1997 overages was untimely and apparently resulted in double-counting and therefore is in violation of the Magnuson Act, the RFA and this Court's prior order. Therefore, the Court is impelled to sanction the Secretary and, as a corrective action, it could do so by 762,397.2 pounds without impacting the Secretary's regulations concerning a stock assessment goal of F =.23 for 1997. *See* 50 C.F.R. § 648.100(a). The Court notes that in light of this proceeding and others pending, North Carolina has been fully audited and the amount of reported landings is probably correct. All the parties seem to agree that the State of North Carolina has an excellent if not the best track record for reporting and collecting appropriate data. The Fisheries Service has assumed that in determining the stock assessment or flounder population for setting an initial quota, flounder landings are under-reported by a minimum of 20% of the initial quota and a maximum of 50% of the initial quota. Thus, a viable option seems to be restoring 20%, or the minimum amount of the original quota adopted for the year 1997, which would keep the figures within F =.23. The original 1997 quota was set at 3,049,589 pounds. *See* 62 Fed.Reg. 10473. That represents the maximum of 80% of what are considered landings in North Carolina for computing the 1997 stock assessment, or F =.23. 100% of what are considered landings in North Carolina would be an amount equivalent to 3,811,986.2 pounds. Subtracting the two figures (3,811,986.2 − 3,049,589), one

arrives at a figure of 762,397.2 pounds, which would not affect F =.23.

For the moment, however, the Court sanctions the Secretary and only sets aside the 1997 summer flounder quota by up to 399,740 pounds as being arbitrary and capricious. This figure constitutes the total amount of penalty adjustment that the Secretary applied in 1998 for overfishing in 1997. The Court arrives at this figure by adding the overage announced by the Secretary on January 23, 1998 (181,607 lbs.), and the overage announced by the Secretary on April 28, 1998 (218,133 lbs.). The Court finds that the penalty adjustment was untimely and was seemingly based on double-counting of 1997 overages well-known to the Secretary's subordinates months before the beginning of the January 1998 fishing season. The Court further orders that the Secretary and his subordinates may not consider the 399,740 pounds as overfishing in setting a summer flounder quota for any subsequent years. In imposing this sanction, the Court admonishes the Secretary that it is not amused that his agency has failed abysmally to follow the prior orders of this Court. Without hesitation, this Court will make sure that in the future, the Secretary and his designees do not fail again. Therefore, the Court retains jurisdiction over these proceedings and may revisit this entire matter for the purposes of enforcement of its prior orders.

### III. Conclusion

The quota as adjusted was arrived at arbitrarily and capriciously. It was violative of the regulatory statutes as well as the prior orders of this Court. The so-called Economic Analysis was not actually what it was purported to be or ordered by this Court. It entirely failed to consider the effect on fishing communities or small entities. It failed to consider the economics as it may have affected actual fishermen. It never considered profitability or costs of any kind. It merely discussed gross revenues on a statewide basis. The quota's adjustments and its setting utilized double counting and suppositions which were not justifiable.

The so-called analysis submitted to the Court was clearly skewed. It analyzed by utilizing the number of licenses granted to

those who someday in the future might catch some summer flounder. By using that method, the Secretary could say that only 19% of those who hold licenses will experience revenue reductions, regardless of whether 38% who actually fish are impacted. Their own figures show that less than half of all licensed vessels (808 out of 1696) landed flounder. Thus, one half of the permitted licensees were not affected by quota reductions since they did not fish for flounder at all. They merely had a permit in case they landed some flounder or to keep a license for the future.

The Secretary's own 1992 study of Wanchese, North Carolina, which is appended to the skewed Analysis, shows the dependence of small communities and entities on the fishing industry. In particular, the study underscores the central importance of summer flounder to the fishermen and other residents of Wanchese, North Carolina. The Secretary totally ignored these findings appended to his so-called "economic analysis". It is one thing to conduct an analysis with unknown information and another to conduct an analysis by disregarding known information. To take another example, the Secretary seems to believe that a 50% reduction in gross revenue is a little heavy but not devastating. This would assume that commercial fisherman have no overhead or fixed costs of operation. This new and perplexing theory would cause anyone familiar with business to cringe. Indeed, anyone who has any business acumen reading the Secretary's report with appropriate information could arrive at only one conclusion—the flounder fishermen were devastated.

The Court GRANTS Plaintiffs' North Carolina Fisheries Association, and Georges Seafood, Inc. and the State of North Carolina and North Carolina Department of Environment, Health, and Natural Resources renewed cross motion for summary judgment. The Court DENIES Defendant Secretary of Commerce's cross motion for summary judgment. The Court finds that the Secretary acted arbitrarily and capriciously in failing to provide any meaningful consideration to the economic effects on fishing communities brought on by his 1997 commercial flounder quota regulations and in ignoring the prior order of this Court. The Secretary did not make a good faith attempt at reasonable compliance with the Regulatory Flexibility Act and the Magnuson–Stevens Act. The Court also finds that the Secretary did not establish quota adjustments based on 1997 overages in a timely manner, and he apparently double counted the amount of the 1997 overages by some 80,000 pounds, in violation of the Magnuson Act and the RFA and this Court's October 10, 1997 order.

The Secretary relied on others to prepare the so-called Economic Analysis ordered by this Court. Unfortunately, those who prepared it seem to have been solely interested in protecting the fish, and they lacked any consideration of the fishermen or fishing communities as required by both the Regulatory Flexibility Act and the Magnuson–Stevens Fishery Conservation and Management Act. The Secretary himself relied on those in the agency to comply with the Court order, and although the designees of the Secretary clearly violated that order, the Court does not find the Secretary to have been personally involved.

The Court sanctions the Secretary and sets aside the 1997 commercial flounder quota by 399,740 pounds as arbitrary and capricious. In imposing this sanction, the Court notes that as a corrective measure, it could have sanctioned the Secretary by up to 762,-397.2 pounds without impacting the Secretary's regulations concerning a stock assessment goal of F=.23 for 1997. Yet for the time being, the Court only will set aside 399,740 pounds as a sanction, the total amount of which represents the penalty adjustment that the Secretary applied for 1997 overages. The 1997 overages were untimely and were apparently based on double counting. In setting aside the 399,740 pounds, the Court ORDERS the Secretary and his subordinates not to utilize that figure as "overfishing" for any subsequent years in setting a summer flounder quota. The Court cautions the Secretary of Commerce that thus far, his designees have shown little or no regard for the orders of this Court. The agency has tested the outer limits of this Court's patience. In the future, the Court will not

hesitate to enforce its orders to their fullest extent. It will hold accountable any individual whose actions are contemptuous of this Court. In that respect, the Court retains jurisdiction of these proceedings and may revisit the entire matter for purposes of enforcement of its prior orders.

IT IS SO ORDERED.