ATLANTIC FISH SPOTTERS ASSOCIA-
TION, Jonathan E. Mayhew, Raynold F.
Brooks II, and Robert Sampson, Plain-
tiffs,

v.

William M. DALEY, Defendant.

No. 97–11882–JLT.

United States District Court,
D. Massachusetts.

June 10, 1998.

H. Reed Witherby, Boston, MA, Garrick F. Cole, Smith & Duggan, Boston, MA, David E. Frulla, Brand, Lowell & Ryan, P.C., Washington, DC, for Plaintiffs.

John A. Capin, U.S. Attorney's Office, Asst. U.S. Atty., Boston, MA, Mark A. Brown, U.S. Dept. of Justice, Wildlife & Marine Resources, Washington, DC, for Defendant.

## MEMORANDUM

TAURO, Chief Judge.

Plaintiffs in this case challenge a regulation promulgated by the Defendant Secretary of Commerce, William M. Daley, pursuant to the Atlantic Tunas Convention Act of 1975 (the "ATCA"). That regulation bans the use of small aircraft or "spotter planes" by certain fishing permit holders in the har-

vesting of Atlantic Bluefin Tuna ("ABT"). Prior to enactment of the regulation, these aircraft aided the affected commercial ABT fishermen by spotting schools of these fish from the air and notifying the fishermen of their location in the water. Plaintiffs include the owners and pilots of spotter aircraft and certain permitted fishing vessels that have employed them. Collectively, Plaintiffs seek judicial invalidation of the regulation and, in turn, the lifting of the ban.

## I.

### BACKGROUND

The ABT has almost incomparable value among fish species harvested in the Western Atlantic, if not the world. In fact, a single ABT may sell for more than $50,000. The ABT is an elusive, highly migratory fish, often traveling at speeds of up to 50 miles per hour. Consequently, competition among fishermen for ABT is keen.

#### A. Fishing Permit Categories and Their Respective Quotas

Commercial ABT fishermen must acquire a permit in one of several alternative categories in order to legally harvest ABT. Relevant regulations propound three permit categories pertinent to this case: the General Category, the Harpoon Category, and the Purse Seine Category. The largest permit category, the General Category, covers fishermen using most types of ABT fishing methods, including harpoons and rods and reels, but excluding purse seine nets. The regulatory ban on spotter planes applies only to members of the General permit category. Fishermen holding permits in the Harpoon Category may only use the harpoon method of harvesting ABT, but may be aided through the use of spotter aircraft. Finally, fishermen holding permits in the Purse Seine Category may use only the purse seine method. This method involves the use a large nets to trap many ABT at a time. Very few fishermen are given the purse seine permit, as the yield per cast is extremely high.

Under each of the permit categories, fishermen are subject to quotas that limit both their daily ABT catch and their seasonal ABT tonnage. Vessels holding General Category permits may land only one ABT per day, but the category, in its entirety, is allotted a large seasonal maximum of 633 metric tons. In contrast, vessels holding Harpoon Category permits have no daily limit, but this category, in its entirety, is subject to a smaller seasonal quota of 53 metric tons.[1] Regardless of the permit category into which they fall, commercial ABT fishermen may land only those ABT that are of "harvestable" size.

#### B. The Contested Regulation

Under the ATCA, the Secretary of Commerce may promulgate such regulations as are "necessary or appropriate" to carry out the purposes and objectives of the International Convention for the Conservation of Atlantic Tuna. See 16 U.S.C. § 971d(a). These purposes and objectives include the maintenance of ABT populations at levels that will permit the maximum sustainable yield each season, as well as the coordination of scientific research to this end. More generally, the Convention sought to stem the increasing exploitation of tuna by a large number of nations, including the United States.

Although United States commercial fishermen employing harpoon and purse seine fishing methods are the primary users of spotter aircraft, the National Marine Fisheries Service ("NMFS") promulgated a regulation, effective July 18, 1997, banning the use of such planes only in the General Category. See 50 C.F.R. § 285.31(a)(40) More particularly, the regulation states that no person or vessel may

fish for, catch, possess or retain, or attempt to fish for, catch, possess or retain, Atlantic bluefin tuna by means, aid, or use of any aircraft, unless holding a valid permit in the Harpoon or Purse Seine category. . . .

---

1. The General Category is allocated this larger seasonal tonnage, in part, because the majority of ABT fishermen hold that type of permit. Consequently, despite this larger tonnage, competition in the General category remains high.

*Id.* Given the fact that the harpooners and purse seiners are the typical users of spotter aircraft, this regulation adversely impacts harpooner fishermen holding General Category.

## II.

### *ANALYSIS*

A. *Standard of review*

The Administrative Procedure Act (the "APA") governs the court's role in this case. Under the APA, a District Court must apply the arbitrary and capricious standard when reviewing a regulation such as the one at issue here.[2] Although this standard is generally considered "a highly deferential standard of review, it is not a rubber stamp." *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n.*, 59 F.3d 284, 290 (1st Cir.1995). In reviewing the administrative record, the court must "determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

B. *The Administrative Record*

In reviewing the regulation at issue, this court must determine "whether the Secretary's decision to promulgate the ... regulation was consonant with his statutory powers, reasoned, and supported by substantial evidence in the record." *Asoc. Fisheries of Maine v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997).

1. *The Scientific Monitoring Justification*

The Secretary's primary justification for the regulation is that the use of spotter

aircraft impedes effective scientific monitoring of ABT stock through Catch Per Unit Effort ("CPUE") indices. CPUE indices are used, in part, to calculate the total ABT population. Catchability is, in turn, one of the factors used to compile these indices.

According to Defendant, the use of spotter planes increases the rate of ABT catch, thereby allowing each permit category to fill their seasonal quota at an earlier date. Unless properly accounted for, the Secretary argues, these increases in catchability could result in overly optimistic CPUE indices. Presumably, such skewed data would effectively inhibit conservation efforts under the ATCA.

As an initial matter, the court notes the dearth of data proffered by the Secretary in support of his contention that the early seasonal closing trend results directly from airplane use by the fishermen in the General Category. Although the chart included in Document # 32 of the Administrative Record demonstrates that the General Category ABT season has, in fact, closed early in recent years, it fails to correlate this trend with the use of spotter planes.[3] For example, the chart shows that in 1996, General Category fishermen used spotter planes and that the season closed in 74 days. But, according to evidence presented at oral arguments, in 1997, when the spotter ban was in effect, the season closed in only 72 days. Moreover, evidence presented at oral arguments also indicated that planes were in use in 1989 and 1990, when the season remained open for its full 153-day duration. In effect, not only does the data in Document # 32 fail to make the necessary correlation between the shortened season and the use of spotter planes, it directly refutes the existence of such a relationship.

**2.** Relying on *Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1049 n. 23 (D.C.Cir. 1979), Plaintiffs argue that this court should apply a "more exacting" standard of review. That case, however, stated that courts should employ this standard only where, "for some reason, the presumption of agency regularity ... is rebutted, as where the agency has demonstrated undue bias towards particular private interests ... or where an agency has departed from its consistent and long standing precedents or policies ...."

*Id.* Although there is evidence of a departure by the NMFS from a prior ruling on the spotter plan ban issue, the court thinks it prudent to apply the arbitrary and capricious standard of review.

**3.** Notably, Document # 32 appears to be the only document in the administrative record that even attempts to compile relevant data in a probative manner.

Furthermore, the Secretary admits that "it is difficult, if not impossible, to determine the precise effect of spotter plane usage on CPUE [indices] ...." Def. Memorandum at 15. As such, the defendant's factual premises remain disconnected, unsubstantiated, and inconclusive.

Even assuming that the necessary correlation exists among the early seasonal closing trend, spotter plane usage, and skewed CPUE data, there is no support for the agency's decision to ban the use of spotter planes in only the General Category.[4] No conservation concerns have been proffered that would distinguish this group from the Harpoon or Purse Seine permit categories.

In addition, application of the ban to the General Category has little practical effect. The number of fishermen in this category who are most likely to use spotter planes— harpooners—is relatively small and decreasing. In fact, National Marine Fisheries Service ("NMFS") statistics indicate that the ABT harvest by General Category *rod and reel* fishermen has nearly tripled in the past decade, virtually supplanting the General Category *harpoon* harvest, which has plummeted. More specifically, in 1988, rod and reel fishermen made 34.2% of all General Category ABT landings. By 1994, their share doubled to 63.7% of all General Category ABT landings. This figure ballooned further to 85.6% and 88% of all General Category ABT landings in 1995 and 1996, respectively. In contrast, by 1996, the percentage of General Category harpoon landings had shrunk to 6%. Applying the plane ban to only General Category fishermen generally, and harpoon fishermen within this category specifically, has little, if any, rela-

tion to the conservation goals cited by the Defendant Secretary.

Finally, the Secretary undermines his own scientific monitoring justification by admitting that CPUE data are not even collected from harpooners in the General Category— the fishermen affected by the ban. In light of the fact that the primary justification for the ban rests on the need to conduct scientific monitoring, and yet, the ban only affects fishermen whose catch data is *not* included in the CPUE indices, this court can only conclude that scientific monitoring cannot possibly serve as a rational basis for the regulation.[5]

### 2. *The Fish Size Justifications*

■ The Secretary argues that pilots cannot successfully gauge the size of individual fish in the water and, consequently, induce increased harvesting of undersized fish.

The fundamental flaw in the Secretary's argument is his failure to proffer any evidence that discards of nonharvestable fish has increased in proportion to spotter plane use. In fact, the administrative record supports just the opposite. The record reveals that spotter planes actually aid fishermen in targeting and landing harvestable-sized ABT. While noting the paucity of reliable evidence on the topic, the Environmental Assessment and Regulatory Impact Review ("EARIR") conducted during the administrative rule-making stage states,

> As spotter planes are able to determine the approximate size class of a school of bluefin, prohibiting the use of spotter aircraft in the General category may increase

---

4. Defendant asserts that the ban was not applied to the Harpoon category because catch rates are too dependant on the weather to be useful in developing indices of abundance (i.e., CPUE measures). This argument is not persuasive. The same concern would effect the harpoon fishermen in the General Category and these are the only General Category fishermen who employ spotter planes.

5. In addition to the flawed logic employed by the Secretary in his attempt to justify the regulation, it appears that spotter planes may, in fact, contribute significantly to scientific monitoring efforts. In particular, the pilots of these planes collect ABT stock data while on the job by con-

ducting aerial surveys. The administrative record supports this contention insofar as it contains anecdotal evidence that, consistent with the ATCA's mandate, spotter aircraft, flying 40,000 annual miles, have photographed between 40,-000 and 45,000 ABTs each year virtually free of charge. These efforts have led to a four-fold increase in the estimated ABT stock size between 1993 and 1996. Adjudging from the record, the following conservation organizations support this contention: The Massachusetts Audubon Society, The Center for Coastal Studies, The New England Aquarium, and The Conservation Law Foundation.

the potential for catching undersized fish ... and could lead to increased discards. Administrative Record, Document # 38, p. 8. Because the record lacks any substantial evidence, concerns about the size of ABT caught during the General Category season do not support the Secretary's spotter plane regulation.

### 3. *The Safety Justification*

■ Lastly, the Secretary claims that the use of spotter planes poses safety issues justifying the regulation. Specifically, he posits that the use of spotter planes in the ABT fishery results in planes and boats converging in the same areas, causing hazardously congested water and air space. Further complicating matters, the Secretary states, is the fact that these planes engage in dangerously aggressive behavior despite such congestion.

But, the relationship between Defendant's claims and the regulation at issue is, yet again, incongruent. If, in fact, spotter planes present such compelling safety issues in ABT fisheries, the obvious agency action would have been to ban such planes in all permit categories. Singling out the General Category, especially given the decrease in harpooners in this category, evidences the arbitrary nature of this regulation.

Furthermore, even if spotter planes present safety problems in ABT fisheries, Defendant has made no efforts to assess their safety record and has presented no credible evidence of their dangerousness. Consequently, the regulation lacks any rational basis in documented fact. Policing of spotter planes through regulatory action does not, moreover, fall within the purview of the Secretary's ATCA mandate. It is the Federal Aviation Administration, and not the Defendant, who wields the authority to police aviators and insure aviation safety.

Finally, as a general matter, even the EARIR concludes that the primary effects of the plane ban are "economic and/or administrative in nature," and do not address conservation concerns.[6] In light of this and all other evidence—or lack thereof—contained in the administrative record, the General category plane ban constitutes and arbitrary and capricious exercise of the agency's authority.

### III.

### CONCLUSION

For the reasons expressed above, the court finds that the enactment of the regulation, banning the use of spotter planes in the General Category, was an arbitrary and capricious exercise of agency authority and, therefore, overturns the regulation *in toto*.

AN ORDER WILL ISSUE.

6. The bulk of the administrative record consists of public comments in the form of letters from apparently disgruntled local fishermen, who proffer no rational basis for promulgation of the regulation. For instance, one fisherman writes, "This is a fishery, for fishermen with boats, not a flying circus." Another writes, "We must rely on our skills as fishermen to catch fish, not on a pilot...." Still another insists, "Plane spotters give an unfair advantage [over] the bluefin tuna. The fish don't have a chance and the sport for tuna is gone. This is too efficient a method." In a final example of the industry's flaring tempers, one letter implores, "Give the tuna back to the fishermen. Please remember, this is a fishery, not a planery."