**SOUTHERN OFFSHORE FISHING ASSOCIATION, et al.,**
**Plaintiffs,**

v.

**William M. DALEY, Defendant.**

No. 97–1134–CIV–T–23C.

United States District Court,
M.D. Florida,
Tampa Division.

June 30, 1999.

Charles Paul Schropp, Schropp, Buell & Elligett, P.A., Tampa, FL, David E. Frulla, Brand, Lowell & Ryan, P.C., Washington, DC, for Southern Offshore Fishing Association, Directed Shark Fishery Association, Seafood Atlantic, Inc., Fishermen's Ice and Bait, Inc., Harrison International Enterprises, Inc., Willie R. Etheridge Seafood Co., Inc., Tristram Colket, Harold West, Bruce Stiller, Glen Hopkins.

Mark A. Brown, Wildlife & Marine Resources Section, Environment & Natural Resources Div., U.S. Dept. of Justice, Ben Franklin Station, Washington, DC, Mariam McCall, NOAA GCF, Silver Spring, MD, for William M. Daley.

Jere W. Glover, Small Business Administration. Office of Advocacy, Washington, DC, for Small Business Administration.

Colin C. Deihl, Dawn McKnight, Mark Hughes, Earthlaw, University of Denver School of Law, Denver, CO, Cody Fowler Davis, Davis & Scarritt, P.A., Tampa, FL, for National Audubon Society, Inc., National Resources Defense Council, Inc., Biodiversity Legal Foundation, Center for Marine Conservation.

## ORDER

MERRYDAY, District Judge.

On May 2, 1997, the plaintiffs initiated this suit, which challenges the 1997 commercial harvest quotas for Atlantic large coastal sharks ("LCS"), small coastal sharks ("SCS"), and pelagic sharks pursuant to the judicial review provisions of the Magnuson–Stevens Act ("Magnuson Act") and the Regulatory Flexibility Act ("RFA"). *See* 16 U.S.C. § 1855(f) and 5 U.S.C. § 611(a)(1). In 1997, the defendant United States Secretary of Commerce (through his designee, the National Marine Fisheries Service ("NMFS")) promulgated a 50 percent quota reduction for LCS, the most commercially significant group of sharks. On February 24, 1998, after extensive briefing and argument and study of a mountainous record that included a full administrative process, I entered an order upholding the quotas against attacks on the scientific method and theory underlying the quotas but rejecting NMFS's putative analyses of the economic effects of the quotas on small business (Doc. 66, the "February 24, 1998, order"). *Southern Offshore Fishing Ass'n v. Daley*, 995 F.Supp. 1411 (M.D.Fla.1998) ("[T]he Secretary acted within his regulatory discretion in setting the quotas but failed to conduct a proper analysis to determine the quotas' economic effect on small businesses."). I held that NMFS's conclusion that the drastic quota reduction would have no meaningful economic effect on commercial shark fishermen was arbitrary and capricious. I noted that the agency's inexplicable failure to recognize the existence of the "directed shark fishery."—a small but well defined group of fishers who concentrate their commercial efforts on harvesting shark stocks—undoubtedly tainted the agency's statutorily required consideration of less restrictive alternatives in formulating the quotas. As the Court stated,

Having studied the entire record, I conclude that the Secretary's "no significant impact" certification and the [Final Regulatory Flexibility Analysis ("FRFA")] fail to satisfy [Administrative Procedure Act ("APA")] standards and RFA requirements. The record strongly indicates that the 1997 quotas, and most prominently the LCS quota, will significantly injure the prospects of shark fishermen pursuant to Commerce

Department thresholds. The record also severely discredits NMFS's argument that no fishermen are dependent on shark fishing and that the plaintiffs can effortlessly transfer their fishing efforts to other stocks. One can no more readily change a bass boat to a flats boat than change directed shark fishing paraphernalia to equipment for profitable tuna fishing. To suggest otherwise is to transgress the knowledge and common sense that are insinuated into reality; it is a contrivance that imports arrogance.

The lapses and inconsistencies in the record most likely stem from NMFS's failure to prepare an [Initial Regulatory Flexibility Analysis ("IRFA")] in the first instance. Pursuant to § 603, an IRFA would have required NMFS to engage in a careful and meaningful study of the problem from the beginning. With notice of NMFS's position, the public could have engaged the agency in the sort of informed and detailed discussion that has characterized this litigation. Instead, NMFS chose an insular approach designed to block further investigation and public scrutiny. NMFS compounded this error by preparing a FRFA that constitutes an attempt to agreeably decorate a stubborn conclusion.

NMFS prepared an FRFA lacking procedural or rational compliance with the requirements of the RFA. Section 604 requires that any FRFA contain "a summary of the significant issues raised by public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments." 5 U.S.C. S 604(a)(2). NMFS could not possibly have complied with § 604 by summarizing and considering comments on an IRFA that NMFS never prepared. NMFS's refusal to recognize the economic impacts of its regulations on small businesses also raises serious question about its efforts to minimize those impacts through less drastic alternatives. Section 604(a)(5) requires each FRFA to "descri[be] ... the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes" and then to explain why the agency chose a particular course. NMFS may not have rationally considered whether and how to minimize the 1997 quotas' economic impacts because the agency fundamentally misapprehended the unraveling economic effect of its regulations on small businesses.

I am mindful that the RFA does not require mechanical exactitude. However, the statute compels the Secretary to make a "reasonable, good-faith effort," prior to issuance of a final rule, to inform the public about potential adverse effects of his proposals and about less harmful alternatives. Consideration of the record as a whole convinces me that the Secretary's defalcation unlawfully compromised his ability to render a reasoned and informed judgment with respect to the reduced quotas' economic impact on small businesses. Accordingly, summary judgment in favor of the plaintiffs is appropriate.

*Southern Offshore Fishing Ass'n v. Daley,* 995 F.Supp. 1411, 1436–37 (M.D.Fla.1998) (citation and footnote omitted). Accordingly, the Court remanded the "agency's RFA determinations to the Secretary with instructions to undertake a rational consideration of the economic effects and potential alternatives to the 1997 quotas." *Southern Offshore Fishing Ass'n,* 995 F.Supp. at 1437. Of special import to the current proceedings, the Court stated the following with respect to the Court's continuing jurisdiction during remand:

On or before May 15, 1998, the Secretary shall submit to the Court an analysis that complies with applicable law. *The Court will retain jurisdiction over this case to review the economic analyses the Secretary conducts pursuant to this order. Considering the delicate*

*status of the Atlantic sharks (especially LCS) and pursuant to § 611(a)(4), the public interest requires maintenance of the 1997 Atlantic shark quotas pending remand and until further order of the Court.*

*Southern Offshore Fishing Ass'n,* 995 F.Supp. at 1437 (emphasis added, citation and footnote omitted).[1]

Following remand, on May 15, 1998, the defendant submitted to the Court a document entitled "Final Consideration of the Economic Effects and Potential Alternatives to the 1997 Quotas on the Atlantic Large Coastal Shark Fishery" (Doc.71) (the "remand submission"). In the remand submission, the defendant finally conceded the obvious: the drastic quota reductions imposed by the Secretary caused significant financial hardship. In finding that the 1997 quotas "may have had a significant economic impact on a substantial number of small entities," NMFS departed from its previously intractable position of "no significant impact." Remand Submission at 3 and 37; *see Southern Offshore Fishing Ass'n v. Daley,* 995 F.Supp. 1411, 1433–37 (M.D.Fla.1998). Nevertheless, despite NMFS's substantial concession, the remand submission in large part perpetuated the agency's analyses rejected previously by the Court.

The plaintiffs lodged objections to the remand submission, vigorously contesting the Secretary's methods and conclusions and requesting the appointment of a special master. The Court heard oral argument on these matters on October 1, 1998. On October 17, 1998, the Court issued an order rendering a preliminary review of the defendant's remand submission and expressing grave concern over the defendant's analyses (Doc. 85, "the October 17, 1998, order"). The Court summarized the defendant's "reluctance and equivocation" as follows:

Upon my preliminary review of the defendant's submission, I remain troubled by NMFS's economic impact analysis pursuant to the Magnuson Act and the RFA. NMFS continues to rely on the pool of 2,000–plus individuals who hold shark fishing permits to constitute the "universe" of fishermen potentially affected by the quotas. *See* Remand Submission at 13–4; *Southern Offshore Fishing Ass'n,* 995 F.Supp. at 1435. NMFS adheres to this view despite the undeniable fact that the clear majority (approximately three-fourths) of the permittees are not expected to land even one shark. Indeed, as NMFS found, only 352 total permit holders caught at least one shark in both 1995 and 1996. NMFS also conveniently overlooks the fact that in its "Pre–Draft HMS Fishery Management Plan" of August 22, 1998, the agency proposes to exclude the majority of current shark permittees through a limited access program that authorizes access only to the modest number of fishermen showing an historic dependence on shark stocks. Thus, while claiming that anyone who spends $10 to buy a shark permit bears an intrinsic interest in the shark fishery (and is thus potentially affected by the quotas), NMFS simultaneously discounts as mere speculative investors a large percentage of the permit holders through its restricted access program. Of course, electing the 2,000–plus permit holders as the operative universe enables NMFS to disperse arithmetically the statistical impact of the quotas on shark fishermen. This strategy conveniently allows the agency to point to the expansive (but unsurprising) number of shark permit holders who also hold permits for, and actively fish, other commercially lucrative stocks such as tuna

---

1. The Court directed the Clerk to enter judgment accordingly and to "administratively close" the file pending further order of the Court. An administrative closure is a short-hand accounting instruction utilized for internal bookkeeping purposes only; the term has no jurisdictional meaning or effect.

and swordfish. This premise in turn facilitates the argument that gear conversion and transferability costs remain untouched, a notion rejected previously by the Court. *See Southern Offshore Fishing Ass'n*, 995 F.Supp. at 1435–36.

Most distressing is the agency's apparently superficial analyses of less restrictive alternatives to the quota reduction. After extensive discussion and summary of its statistical modeling, NMFS's report devotes only four of fifty pages to considering potential alternatives. Remand Submission at 33–6. At least one of those pages contemplates such illuminating alternatives as "closure of the LCS fishery" and maintenance of the "status quo." Remand Submission at 33–4. In the end, the defendant affords minimal treatment to more realistic and constructive alternatives such as minimum size limits, nursing and pupping area closures, and staggered closures. Remand Submission at 34–6. Not surprisingly, even two years after the Shark Operations Team recommended the development of these alternatives as effective methods of mitigating the harsh effects of quotas, NMFS tersely concludes in its remand submission that the proposals are not currently feasible, citing (again) insufficient data. Apparently, NMFS requires a startlingly higher quality of science when it proposes less restrictive alternatives than when it lops off a harvest quota by 50 percent (based on ambivalent science). Nevertheless, recently filed documents show that NMFS is *already* proposing in the 1998 SEW Report and the Pre–Draft FMP (August 20, 1998) specific minimum size limits for some species of sharks, including the dusky and sandbar sharks. NMFS's seemingly cosmetic and cursory consideration of available alternatives to the quotas is, to say the least, disconcerting. The apparent lapses and inconsistencies in NMFS's analyses are perhaps attributable to the agency's studied underestimation of the economic privations suffered by directed shark fishers at the hands of government regulators who lured them into dependence in the first instance. In any event, NMFS's dilution of the estimates of the effects of the catch quotas on directed shark fishermen evidences persuasively that "NMFS may not have rationally considered whether and how to minimize the ... quotas' economic impacts." *Southern Offshore Fishing Ass'n*, 995 F.Supp. at 1436.

The defendant's equivocations notwithstanding, the record clearly supports the conclusion—and I so find—that the 1997 LCS quotas visited on shark fishermen a tangible and significant economic hardship. The existence of directed shark fishermen, the small but significant group of fishermen who are largely dependent on sharks, is undeniable. The financial adversity suffered by directed shark fishermen as a result of the 1997 LCS quotas surpasses comfortably NMFS's own RFA regulatory thresholds. *See Southern Offshore Fishing Ass'n*, 995 F.Supp. at 1435. My preliminary review of the defendant's remand submission suggests that NMFS inadequately considered, and perhaps overlooked altogether, feasible alternatives or adjustments to the 1997 quotas that may mitigate the quotas' pecuniary injury to the directed shark fishermen.

October 17, 1998, order, pp. 4–7 (footnote omitted).

To assist the Court in its consideration of remaining issues, the Court appointed Professor Stephen Rubin of Washington, D.C., to serve as special master pursuant to Rule 53 of the Federal Rules of Civil Procedure. The Court charged Professor Rubin with the task of "analyzing the *bona fides* of the defendant's remand submission with respect to the availability of workable alternatives, regulatory or otherwise, to the 1997 LCS quotas." October 17, 1998, order, p. 7. Tracking the language of the February 24, 1998, order, the Court again expressed its obvious intention to retain

continuing jurisdiction over remand proceedings: *"In the interest of justice and pursuant to 5 U.S.C. § 611(a)(4) the Court will maintain in effect the 1997 Atlantic shark quotas pending further consideration."* (Emphasis added.)

The defendant interposed objections to the special master referral, inviting the Court instead to again remand the matter to the Secretary for yet further analysis. By order dated November 4, 1998 (Doc. 88, the "November 4, 1998, order"), the Court overruled the defendant's objections, refined the special master's charge, and set an expedited schedule:

In creating and adjusting management plans for highly migratory species, the Secretary is required by the Magnuson–Stevens Act and the Regulatory Flexibility Act to undertake reasonable steps to protect the interests of fishermen by pursuing feasible and less restrictive alternatives to regulatory measures that adversely and materially affect small business. See 16 U.S.C. § 1855(f) and 5 U.S.C. § 611(a)(1). In determining whether the defendant complied in good faith with these statutes, I am not obligated to proceed myopically through the field of inconsistencies presented by the government's view of pertinent matters. Effective and informed judicial review is contemplated by the Magnuson Act and the RFA. Considering NMFS's recalcitrance in this case, especially in light of similar behavior identified in *North Carolina Fisheries Ass'n v. William M. Daley*, 27 F.Supp.2d 650 (E.D.Va. 1998) (slip op.), I am particularly unwilling to rely on NMFS's bureaucratic pleasures in ascertaining that same bureaucracy's statutory compliance. The purpose of the special master in this case is not, as the defendant supposes, to substitute my judgment for that of the Secretary. See *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The purpose of

the special master is to expedite the Court's establishment of reliable and disinterested evidentiary referents by which to evaluate the defendant's actions and, if warranted, to design remedies.

In the October 16, 1998, order, I charged the special master with the task of evaluating "the bona fides of the defendant's remand submission with respect to the availability of workable alternatives, regulatory or otherwise, to the 1997 quotas." This analysis contemplates consideration of feasible alternatives to the 1997 LCS quotas in light of scientific and other information (1) that NMFS possessed and utilized in formulating its May 15, 1998, remand analysis, (2) that NMFS (in good faith and with the exercise of reasonable diligence) should have compiled and utilized in formulating its May 15, 1998, remand analysis, and (3) that NMFS became aware of, or should have (in good faith and with the exercise of reasonable diligence) become aware of, after the May 15, 1998, remand analysis. In this informed context the special master can engage in a considered and deliberate assessment of whether the defendant undertook a "reasonable, good-faith effort" in considering feasible alternatives to the 1997 LCS quotas. See *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 114–15 (1st Cir.1997). If the special master concludes that the defendant acted in bad faith or contrary to law in considering or developing feasible alternatives to the 1997 LCS quotas, he shall propose one or more legal remedies, whether alternative or cumulative, for consideration by the Court. The special master shall submit his report containing findings of fact and conclusions of law on or before March 1, 1999.

Having twice denied the plaintiffs' request to set aside the 1997 quotas in favor of earlier and less restrictive quotas, the Court expressly cautioned the defendant against complaisance: "My previous order notwithstanding, *see Southern Offshore*

*Fishing Ass'n v. Daley,* 995 F.Supp. 1411 (M.D.Fla.1998), *I caution NMFS against presuming that quota adjustments remain outside the realm of permissible remedies available to the Court."* November 4, 1998, order, n. 1 (emphasis added).

Following court-ordered mediation, on December 18, 1998, the parties submitted a joint motion to temporarily stay the special master proceedings pending settlement negotiations (Doc.93). By order dated January 6, 1999 (Doc.94), the Court granted the joint request and stayed the special master proceedings through and including February 10, 1999, pending good-faith settlement negotiations. Tracking the language of the parties' request, and confirming the February 24, 1998, order, the Court again emphasized its intention to maintain the status quo during the pendency of remand proceedings: "The Court's deadlines relating to the special master proceedings are extended by sixty days. During the stay period existing quotas shall remain in effect without effectuation of any new regulations regarding catch quotas." January 6, 1999, order. Following subsequent requests from the parties and by orders dated February 12, 1999 (Doc. 96), and April 30, 1999 (Doc. 99), the Court extended the stay of the special master proceedings through and including June 21, 1999, pending good-faith settlement negotiations. Again the Court reminded the parties that, "[d]uring the stay period existing quotas shall remain in effect without effectuation of any new regulations regarding catch quotas." Of course, perforce the February 24, 1998, order, the *status quo* persisted between February 10, 1999, and June 21, 1999, independent of the Court's stay orders directed toward the special master proceedings.

On June 3, 1999, the plaintiffs filed a "Notice of Quota Reduction Contrary to Court Order" (Doc. 100). The notice alerted the Court that the defendant had promulgated new regulations, to become effective July 1, 1999, which substantially reduce the Atlantic shark quotas from operative 1997 levels and implement new and much more restrictive fish management and counting methods (the "1999 regulations"). 64 Fed.Reg. 29090 (May 28, 1999). The new regulations impose a 33–35 percent quota reduction from 1997 levels for LCS stocks, reduce the quotas for pelagic sharks, and impose (apparently without any scientific analysis) a new quota for SCS reflecting an 90 percent reduction from 1997 levels. Considering the new minimum size-limit requirements and statistical monitoring methods, including the novel process of counting dead discards and state landings after federal closures (which alone will further reduce the new catch quotas by an estimated 30–60 percent), the 1999 regulations will drastically reduce the overall Atlantic shark quotas from 1997 levels. (With respect at least to LCS, the 1997 regulations alone represented a 50 percent quota reduction.) This time, the defendant purports not to ignore the devastating impact of its new regulations on the directed shark fishery:

> [T]he combination of final actions for sharks (quota reductions, minimum sizes, retention limits, and counting dead discards and state landings after Federal closures against Federal quotas) *may result in the elimination of the directed shark fisheries for large coastal sharks,* and may substantially impact commercial fisheries for pelagic sharks and small coastal sharks in the U.S. exclusive economic zone.

64 Fed.Reg. 29130 (emphasis added).

On June 11, 1999, the Court issued an order requiring the parties to show cause why "preventative relief and contempt sanctions (including injunctive relief and fines, if appropriate)" should not issue against the defendant agency for its "imminent violation" of the Court's orders, including the Court's February 24, 1998, order maintaining 1997 Atlantic shark quotas "pending remand and until further order of the Court" (Doc. 101). Following written responses from the defendant and

*amici curiae* (Docs. 102, 103, and 105) and a cross-reply from the plaintiffs (Doc. 104), the Court held a hearing on June 24, 1999. The next day, on June 25, 1999, the plaintiffs filed a new law suit (Case No. 99–1455–CIV–T–24C) with the Court, challenging the 1999 regulations. On June 28, 1999, the Honorable Susan C. Bucklew transferred the new law suit to the undersigned for consideration with Case No. 97–1134–CIV–T–23C.

NMFS and *amici* take the position that the 1999 regulations are perfectly consistent with the Court's previous orders, representing merely a required step in the agency's ongoing obligation to manage and preserve fish stocks. NMFS argues that, following an October, 1997, report to Congress that shark stocks are "overfished," the agency was obligated to forthwith design and effectuate new regulations to rebuild stocks. *See* 16 U.S.C. § 1854(e)(3) (defendant shall develop rebuilding plan within one year of identifying species as overfished). (The one year period expired in 1998, well before July 1, 1999.) The plaintiffs and others implored the agency not to effectuate the regulations until the Court relinquished jurisdiction over the ongoing remand proceedings and entered a final order.[2] Nonetheless, considering itself wholly unimpeded by the Court's orders, the defendant agency proceeded unilaterally to further restrict the operative shark quotas without notifying the Court or seeking consent, or preliminary or expedited review, from the Court, as if supposing the two matters unrelated.

The Court agrees with the plaintiffs that the defendant has violated both the spirit and letter of the Court's rulings in this case by implementing the final 1999 regulations. The February 24, 1998, order, states unequivocally that, "The Court will retain jurisdiction over this case to review the economic analyses the Secretary conducts pursuant to this order. Considering the delicate status of the Atlantic sharks ... the public interest requires maintenance of the 1997 Atlantic shark quotas *pending remand and until further order of the Court.*" *Southern Offshore Fishing Ass'n v. Daley,* 995 F.Supp. 1411, 1437 (M.D.Fla.1998) (emphasis added). This statement is an unequivocal expression of the Court's intention to maintain the *status quo* and to preserve the Court's jurisdiction over this matter pending substantive, ongoing remand proceedings. This intention appeared again in the October 17, 1998, order, in which the Court preliminarily determined that NMFS's remand submission was legally inadequate and appointed a special master to both review the *bona fides* of the submission and to propose an appropriate remedy: "In the interest of justice and pursuant to 5 U.S.C. § 611(a)(4) the Court will maintain in effect the 1997 quotas *pending further consideration.*" (Emphasis added.) This mandate, as the February 24, 1998, directive, clearly requires maintenance of the 1997 quotas *unless and until* the Court decides otherwise. The statement plainly imports the notion that, until the Court orders otherwise, the *status quo* persists. Naturally, any conduct which, absent leave of Court, purports to alter the *status quo* is directly proscribed. Nothing contained in the Court's orders granting temporary stays of the special master proceedings (Docs. 94, 96, and 99) modified the Court's clear mandate. The provisions in those orders stating that, "during the stay period existing quotas shall remain in effect

2. The following exchange (presumably originated by the plaintiffs) is found in the comment section of the 1999 regulations:
  *Comment 12:* NMFS should have its assessments peer reviewed before taking any further action, *especially since the 1997 regulations are still the subject of legal review. Response:* NMFS disagrees. The 1998 stock assessment represents the best avail-able scientific information and peer review prior to implementing these measures is not necessary.
  64 Fed.Reg. 29090, 29110 (May 28, 1999) (emphasis added). At the very least, NMFS knew that the plaintiffs and others assumed the position that the 1999 regulations were inconsistent with this Court's orders.

without effectuation of any new regulations regarding catch quotas," simply punctuated the Court's intention to preserve jurisdiction and maintain the *status quo*. The stay orders directed at the special master proceedings were wholly superfluous except for the need to emphasize that the pendency of the special master proceedings implied no change in the February 24, 1998, order and that the *status quo* should persist absent specific court authority.

No question lingers with respect to the substance and import of the remand proceedings ordered by the Court. Any doubt about the Court's exclusive authority and jurisdiction over ongoing remand proceedings, including the special master proceedings, should have been dispelled by the Court's November 4, 1998, order, which (the Court's February 24, 1998, order notwithstanding) cautioned NMFS "*against presuming that quota adjustments remain outside the realm of permissible remedies available to the Court.*" (Emphasis added.) At this point NMFS was expressly and undeniably on notice

that the 1997 quotas remained in effect only until the Court had an opportunity, with the assistance of the special master, to fully review the defendant's remand submission and the *bona fides* of the defendant's conduct. Until such time, the "score," i.e., the quota level, was to remain the same. Absent some indication that the defendant intended to proceed both unilaterally and contrary to Court order, for example, by promulgating quotas that would profoundly alter the *status quo*, no express injunction (that is, an injunction that specified some particular, but still prospective mischief) against NMFS was necessary. Without the sibylline vision of defiant activity and, rather, assuming the *bona fides* of NMFS, nothing remained to more expressly enjoin. The passage of time and events now impels the Court to reconsider this notion.

■■■ Having observed NMFS's conduct in this litigation, as well as in *North Carolina Fisheries Ass'n v. Daley*, 27 F.Supp.2d 650 (E.D.Va.1998, Doumar, J.)[3]

**3.** In *North Carolina Fisheries Ass'n v. Daley*, 27 F.Supp.2d 650 (E.D.Va.1998), Judge Doumar held that NMFS utterly failed to comply with RFA requirements in setting the 1997 summer flounder fishery quota. The following passage exemplifies Judge Doumar's frustration with the agency's recalcitrance:

The quota as adjusted was arrived at arbitrarily and capriciously. It was violative of the regulatory statutes as well as the prior orders of this Court. The so-called Economic Analysis was not actually what it was purported to be or ordered by this Court. It entirely failed to consider the effect on fishing communities or small entities. It failed to consider the economics as it may have affected actual fishermen. It never considered profitability or costs of any kind. It merely discussed gross revenues on a state-wide basis. The quota's adjustments and its setting utilized double counting and suppositions which were not justifiable.

The so-called analysis submitted to the Court was clearly skewed. It analyzed by utilizing the number of licenses granted to those who someday in the future might catch some summer flounder. By using that method, the Secretary could say that only 19% of those who hold licenses will experience revenue reductions, regardless of whether 38% who actually fish are im-

pacted. Their own figures show that less than half of all licensed vessels (808 out of 1696) landed flounder. Thus, one half of the permitted licensees were not affected by quota reductions since they did not fish for flounder at all. They merely had a permit in case they landed some flounder or to keep a license for the future.

The Secretary's own 1992 study of Wanchese, North Carolina, which is appended to the skewed Analysis, shows the dependence of small communities and entities on the fishing industry. In particular, the study underscores the central importance of summer flounder to the fishermen and other residents of Wanchese, North Carolina. The Secretary totally ignored these findings appended to his so-called "economic analysis". It is one thing to conduct an analysis with unknown information and another to conduct an analysis by disregarding known information. To take another example, the Secretary seems to believe that a 50% reduction in gross revenue is a little heavy but not devastating. This would assume that commercial fisherman have no overhead or fixed costs of operation. This new and perplexing theory would cause anyone familiar with business to cringe. Indeed, anyone who has any

and *Atlantic Fish Spotters Ass'n v. Daley,* 8 F.Supp.2d 113 (D.Mass.1998, Tauro, C.J.)[4], I reluctantly conclude that in this instance NMFS is an agency willing to pursue its institutional objectives without acknowledging applicable Congressional and judicial limitations. The Court has found in this case that the agency illegally instituted the 1997 quotas by failing to minimize and account for the socio-economic impact of the quotas on small business, precisely in defiance of the Congressional mandate that NMFS wisely balance shark interests against human interests. Although the preservation of Atlantic shark species is a benevolent, laudatory goal, conservation does not justify government lawlessness. According to Congress, NMFS cannot act to preserve sharks heedless of the human costs. The Magnuson Act and the RFA place on the agency an affirmative and significant statutory obligation to protect the interests of fishers by pursuing feasible and less restrictive alternatives to monolithic regulatory measures that adversely and materially affect small business. *See* 16 U.S.C. § 1855(f) and 5 U.S.C. § 611(a)(1). From the time that the plaintiffs instituted this action on May 2, 1997, over two years ago, the Court has yet to find that NMFS complied with

the law. Although empowered to regulate, NMFS is not empowered to regulate in any manner it chooses, regardless of cost, lawfully or unlawfully.

Having thus far failed to demonstrate the legality of its prior rule-making, the agency nonetheless wishes to proceed, unimpeded, by enacting regulations which impose draconian and probably confiscatory limits on commercial shark fishing and which (admittedly) drive the directed fishery out of business. Meanwhile, the plaintiffs, who have repeatedly succeeded in prosecuting the defendant's defalcations, have reaped no reward and enjoyed no relief. Congress did not design to permit this oppressive and unfair result under the governing circumstances.

The defendant urges that the 1999 regulations, while perhaps presenting an issue for another day, are irrelevant to this case and to the ongoing remand proceedings. NMFS casually points to the expedited, judicial review provisions of the Magnuson–Stevens Act as the sole mechanism for relief in the plaintiffs' challenge to the 1999 regulations. *See* 16 U.S.C. § 1855(f). However, even if NMFS is otherwise correct in this regard, things are quite different now that the 1999 regulations are directly within the Court's jurisdiction by

---

business acumen reading the Secretary's report with appropriate information could arrive at only one conclusion—the flounder fishermen were devastated.

*North Carolina Fisheries Ass'n v. Daley,* 27 F.Supp.2d 650, 667–68 (E.D.Va.1998). Judge Doumar's holding came on review of remand proceedings following the court's earlier finding that NMFS promulgated regulations in violation of the Magnuson Act and the RFA. *North Carolina Fisheries Ass'n v. Daley,* 16 F.Supp.2d 647 (E.D.Va.1997) ("[T]he Court notes that the NMFS's actions in this case are troublesome.").

**4.** In *Atlantic Fish Spotters v. Daley,* 8 F.Supp.2d 113 (D.Mass.1998), Chief Judge Tauro concluded that NMFS acted arbitrarily and capriciously in setting regulations which banned the use of "spotter" aircraft dispatched by fishers to harvest Atlantic Bluefin Tuna. The court held that the agency entirely failed to support its claim that spotter airplanes skewed the scientific monitoring of

tuna, induced the harvest of undersized tuna, and posed sundry safety risks. Shortly after choosing to forgo an appeal of Judge Tauro's ruling, NMFS declared its intention to promulgate new regulations which effectuated the same result as the preceding regulations held invalid by Judge Doumar. This month Judge Tauro convened a show-cause hearing similar to the June 24, 1998, hearing in this case to determine whether the Secretary should be held in contempt of court for issuing regulations which conflict with the court's rulings. Ruling from the bench, Judge Tauro orally rejected the defendant's contention that the Magnuson Act precluded the court from sanctioning the defendant for violating court orders. However, because the offensive regulations were not final, the court denied, without prejudice, the plaintiffs' request for sanctions. Judge Tauro announced his intention to convene prompt contempt proceedings consequent upon implementation of final regulations.

virtue of the plaintiffs' new law suit. In any event, permitting NMFS to proceed with its new regulations, irrespective of events occurring in this litigation, nullifies the significance and effect of the current remand proceedings. Allowing a government agency to circumvent the judicial process by permitting the agency to promulgate intervening and incongruous regulations emasculates and disarms completely the remedial mechanism intended by Congress to detect, correct, and prevent reckless and unlawful rule-making. At some point the judicial process must catch up to the regulatory process.

█ Although perhaps justified, contempt proceedings against NMFS are premature and unnecessary at this juncture. (NMFS disingenuously suggested alarm at the prospect, which is remote in the extreme, that this Court would hold Secretary Daley in contempt. No such consequence is contemplated.) Suffice it to say that, by implementing the 1999 regulations, the defendant has violated both the letter and spirit of this Court's orders. At a time when the agency was undergoing substantive remand proceedings and facing the realistic prospect of harsh remedial consequences (including an upward adjustment in quota levels) NMFS should have, at the very least, kept the Court informed of its regulatory intentions and sought leave to implement quotas which have the clear and unambiguous effect of eradicating and decomposing the Court's proceedings on remand. Instead, with considered and purposeful delay, NMFS elected to circumvent unilaterally the judicial process and achieve its desired goals at the expense of justice and fair play. The defendant's litigation position has adulterated into evasion.

Pursuant to the Court's inherent authority and jurisdiction to require *bona fide* compliance with its February 24, 1998, order and other pertinent orders, and pursuant to the remedial provisions of the Magnuson Act and the RFA, the Court hereby preliminarily, and until further order of the Court, expressly **ENJOINS** the defendant and his designees from enforcing the 1999 regulations, 64 Fed.Reg. 29090 (May, 28, 1999), with respect to Atlantic shark commercial catch quotas and fish-counting methods (including the counting of dead discards and state commercial landings after federal closures) that are different from the quotas and fish counting methods prescribed by the 1997 Atlantic shark regulations, 62 Fed.Reg. 16648 (April 7, 1997). *See* 5 U.S.C. § 611(a)(5) ("Nothing in this subsection [providing remedial measures for judicial review] shall be construed to limit the authority of any court to stay the effective date of any rule or provision thereof under any provision of law or to grant any other relief in addition to the requirements of this section.") The Court will consolidate with this action the plaintiffs' complaint challenging the 1999 regulations and set the matter for expedited consideration. Considering the short duration of the commercial shark-fishing season (two to three weeks, twice a year), the injunction imposed by this order (expected, if the defendant is diligent, to last a zoologically inconsequential duration) should have no significant impact on the defendant's long-term goal of rebuilding shark stocks to ideal levels, a process estimated by the defendant to consume roughly thirty years but which will undoubtedly push directed shark fishers into extinction. As counsel for the defendant, Assistant United States Attorney Warren Zimmerman, Chief of Civil Division, Middle District of Florida, stated at the June 24, 1999, hearing before this Court, "[U]nder the '99 regulations the fishing season would go from July 1 to it is estimated July 12th. *So there's very little that's going to happen between now and July 12 that will be all that different from what would happen if the '97 regulations remained in effect instead of these new ones.... And of course, you know, this is only one fishing season.*"

In reviewing the entire record, I determine that maintaining the *status quo*, i.e., the 1997 quota levels, serves the public

interest and provides a prudent and reasoned course for these proceedings. *See* 5 U.S.C. § 611. As characterized *by the defendant* in this litigation, the 1997 quotas (prescribing a 50 percent quota reduction from the 1997 level in LCS landings) represent a highly "cautious, risk-averse" approach to fish management. *See Southern Offshore Fishing Ass'n v. Daley*, 995 F.Supp. 1411, 1431 (M.D.Fla.1998). Nothing in the record, including the 1999 regulations, suggests otherwise. Although NMFS's conduct in this case legally justifies strong remedial measures, setting aside the 1997 quotas in favor of earlier, less restrictive quota levels would have the improper effect of punishing an incautious and perhaps overzealous governmental agency at the expense of the public and the species. Accordingly, the Court will retain the stringent and conservative management measures prescribed by the 1997 regulations pending further judicial review. To the extent inconsistent with this order, the defendant's "Emergency Motion to Dissolve Injunction" (Doc. pending) is **DENIED.**

I wish to make it perfectly clear that the injunction prescribed by this order is not an open-ended measure adopted for the purpose of precluding the defendant from rule-making simply because, owing to delay procured on behalf of the defendant agency, the Court has not completed its judicial undertaking with respect to the 1997 regulations. Neither is this injunction punishment for governmental misconduct. Appropriate remedies for misconduct exist elsewhere. The injunction is narrowly tailored to the specific facts of this case. My intention is merely to enforce the will of Congress as expressed in the RFA in which consideration of the economic damage to fishers became a condition precedent to lawful regulation of the fishery by NMFS and only secondarily to ensure compliance with the Court's orders, preserve the integrity of the Court, and maintain the *status quo* pending both substantive remand proceedings and consideration of the 1999 regulations in the new case. The Court has carefully reviewed the massive administrative record in this case, as well as the extended proceedings in this Court and elsewhere (to the extent possible by accepted means). My conclusions regarding NMFS's regulatory failures result from a careful analysis of the competing environmental and human considerations prescribed by Congress and are amply supported by the record. I cannot allow the defendant to casually nullify either Congress's express command or the Court's studied efforts by means of either imprudent carelessness or willful evasion.

Remand proceedings with the special master shall proceed forthwith. Any stay imposed on the special master proceedings by order of the Court is hereby **DISSOLVED.** The special master's report and recommendation shall be due on or before September 1, 1999. Objections to the special master's report and recommendation shall be filed with the Court on of before Friday, September 17, 1999.